UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID JESSEN and GRETCHEN JESSEN,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF FRESNO, CITY OF CLOVIS, and DOES 1 to 100, inclusive,<br><br>Defendants. | No. 1:17-cv-00524-DAD-EPG<br><br>ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT<br><br>(Doc. Nos. 40, 41) |

This matter comes before the court on December 4, 2018 for hearing of defendants' motions for summary judgment. (Doc. Nos. 40, 41.) At that hearing, attorney Russell Georgeson appeared on behalf of plaintiffs. Attorney Leslie Dillahunty appeared on behalf of defendant County of Fresno ("County"), and attorney Kevin Allen appeared telephonically on behalf of defendant City of Clovis ("City"). Following oral argument, the matter was taken under submission. Having considered the parties' briefs and oral arguments, and for the reasons stated below, the court will grant defendants' motions for summary judgment.

*/////*

*/////*

*/////*

# BACKGROUND[1]

On the afternoon of June 11, 2016, the Fresno County Sheriff's Office ("FCSO") was notified via a 911 call that a man had broken into and trespassed into the plaintiffs' home. (Doc. No. 40-3 at ¶ 1.) An FCSO officer called plaintiff David Jessen to inform him of the break-in, and requested that Mr. Jessen return to his residence, located at 2235 South Rolinda Avenue in Fresno, California. (Doc. No. 61-3 at ¶¶ 1–2.) Upon arrival, FCSO officers asked Mr. Jessen if there were any firearms in the house and Mr. Jessen responded that there were two shotguns and a handgun in the house. (*Id.* at ¶¶ 8–9.) FCSO officers requested that Mr. Jessen provide the key to the house and instructed him to open the garage door. (*Id.* at ¶ 11.) Mr. Jessen complied with these requests. (*Id.*)

While the officers attempted to unlock the door inside the garage with the key that Mr. Jessen had provided, the suspect inside the home was heard to say twice, "I'm armed, come get me." (Doc. No. 61-2 at ¶ 7.) The key was not working, so FCSO officers commanded the suspect to open the door and exit the residence. (Doc. No. 61-3 at ¶ 118.) The officers instructed Mr. Jessen and his wife, plaintiff Gretchen Jessen, to leave the premises. (*Id.* at ¶ 13.) Thereafter, an FCSO officer requested from the Jessens a floor plan of their house. (*Id.* at ¶ 29.) Mr. Jessen provided a verbal description of the floor plan. (*Id.* at ¶ 30.)

At the Jessens' house, one responding deputy gave Public Address ("PA") announcements ordering the suspect to come out and disarm himself. (Doc. No. 61-2 at ¶ 9.) An FCSO Crisis Negotiator, Deputy Michelle Veneman, also arrived on scene and began to make telephone calls into the residence from her patrol vehicle. (*Id.* at ¶ 11.) At one point, Deputy Veneman's telephone call into the residence was answered by a man who yelled, "Don't fucking come in here, I'm armed!" and then hung up. (*Id.* at ¶ 12.)

A command post was set up some distance from the Jessen residence, and Lieutenant Matt Alexander assumed the role of Tactical Commander. (*Id.* at ¶ 14.) Lieutenant Alexander

---

[1] Plaintiffs dispute many of facts presented in defendants' statements of undisputed material facts. Upon review of the evidence cited by plaintiffs in support of the alleged dispute, the court concludes that plaintiffs have failed to come forward with evidence establishing that any particular fact is *genuinely* disputed on summary judgment.

determined that waiting the suspect out did not appear to be a viable alternative because the suspect was barricaded in the air-conditioned home with plenty of food and water. (*Id.* at ¶ 18.)

Lieutenant Robert Woodrum was assigned to lead the SWAT tactical response and charged with overseeing the deployment of chemical agents at the Jessen residence. (*Id.* at ¶ 21.) To gain an initial assessment of the premises, Lieutenant Woodrum had an Armored Rescue Vehicle ("ARV") circle the Jessen property. (*Id.* at ¶ 23.) During this time, the PA system, emergency lights, siren, and air horn on the ARV were used continuously in an attempt to establish negotiations with or compliance from the suspect. (*Id.*) Lieutenant Woodrum observed a light turn on in what he understood to be the home office. (*Id.* at ¶ 24.) He decided to attempt to deliver chemical agent into that room through the window. (*Id.* at ¶ 26.) Delivery of the initial chemical agents was ultimately unsuccessful in inducing the suspect's surrender. (*Id.* at ¶ 28.)

The Clovis Police Department ("CPD") then arrived on the scene with a Mine-Resistant Ambush Protected ("MRAP") armored vehicle. (Doc. No. 60-2 at ¶ 7.) Sergeant Robert Dutrow with the FCSO joined CPD personnel in the MRAP vehicle. (Doc. No. 61-2 at ¶ 30.) FCSO requested that CPD attach a ram to the MRAP vehicle and breach an exterior door to the home office. (Doc. No. 60-2 at ¶ 8.) CPD breached the office door and confirmed that there was tear gas in the room and no fires had started. (*Id.* at ¶ 11.) FCSO then requested that CPD push down the rear backyard fence in order for the MRAP vehicle to gain access to the sliding-glass door at the rear of the house. (*Id.* at ¶ 12.)

After the sliding-glass door of the home was breached, Sergeant Dutrow drove an Avatar tactical robot into the house. (Doc. No. 61-2 at ¶ 32.) During the time that he was operating the robot, Sergeant Dutrow was also issuing commands to the suspect through its intercom system. (*Id.* at ¶ 33.) With no response from the suspect to the commands over the robot intercom system, Lieutenant Woodrum decided to introduce chemical agents through the laundry room door in an attempt to force the suspect into the living room and out the front door. (Doc. No. 40-7 at ¶ 13.)

The suspect eventually exited the front door, at which time FCSO Deputy Robert Pulkownik placed the suspect under arrest. (Doc. No. 61-2 at ¶ 36.)

The parties dispute whether the operation at the Jessen residence was in fact part of a training program or drill. (*Id.* at ¶ 37.) It is undisputed that a search warrant was not obtained prior to defendants' entry into the Jessen residence. (Doc. No. 61-3 at ¶ 75.)

Plaintiffs filed their complaint in the Fresno County Superior Court on March 8, 2017, alleging the following causes of action against the City, the County, and Does 1 through 100: (1) liability under 42 U.S.C. § 1983 for various violations of the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution; (2) state law negligence; and (3) violations of the California Constitution. On April 13, 2017, defendants removed the action to this federal court. (Doc. No. 1.) On June 16, 2017, the court granted in part and denied in part the County's motion to dismiss certain of plaintiffs' causes of action. (Doc. No. 14.) Specifically, the court dismissed plaintiffs' negligence claim against both defendants with respect to a theory of direct liability only, and dismissed plaintiffs' claims brought pursuant to the California Constitution. (*Id.*)

On September 18, 2018, the City and the County each filed a motion for summary judgment as to all remaining causes of action. (Doc. Nos. 40, 41.) Plaintiffs filed their oppositions on November 6, 2018. (Doc. Nos. 48, 49.) Defendants filed their replies on November 26, 2018. (Doc. Nos. 60, 61.)

**LEGAL STANDARD**

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

In summary judgment practice, the moving party "initially bears the burden of proving the absence of a genuine issue of material fact." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to support the

fact." Fed. R. Civ. P. 56(c)(1)(A), (B). If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. *See* Fed. R. Civ. P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11; *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for summary judgment."). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Wool v. Tandem Computs., Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv.*, 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (citations omitted).

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all reasonable inferences supported by the evidence in favor of the non-moving party." *Walls v. Cent. Contra Costa Cty. Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011). It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987). Undisputed facts are taken as true for purposes of a motion for summary judgment. *Anthoine v. N. Cent. Counties Consortium*, 605 F.3d 740, 745 (9th Cir. 2010). Finally, to demonstrate a genuine issue, the opposing party "must do more than

simply show that there is some metaphysical doubt as to the material facts . . .. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

## ANALYSIS

**A.     Doe Defendants**

In its motion for summary judgment, defendant City of Clovis seeks the dismissal of the Doe defendants on the grounds that no Doe defendants have been substituted in this case or served. (Doc. No. 41 at 25.) Plaintiffs' opposition to the motion for summary judgment did not oppose or otherwise respond to the City's request in this regard.

The use of Doe defendants is generally disfavored in federal court. *Gillespie v. Civiletti*, 629 F.2d 637, 642–43 (9th Cir. 1980). However, plaintiffs "should be given an opportunity through discovery to identify the unknown defendants." *Id.* Here, plaintiffs have identified no additional named defendants and discovery in this action is now closed. Under these circumstances, and because the City's motion to dismiss the Doe defendants is unopposed, the Doe defendants are hereby dismissed in their entirety.[2]

**B.     Section 1983 Claims**

Because the Doe defendants must be dismissed, the only named defendants remaining in this action are public entities, which may be held liable under § 1983 only if plaintiffs can show that their constitutional injury was caused by employees acting pursuant to the City or County's policy or custom. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–94 (1978); *Villegas v. Gilroy Garlic Festival Ass'n*, 541 F.3d 950, 964 (9th Cir. 2008). Under *Monell*, "a municipality cannot be held liable under § 1983 *solely* because it employs a tortfeasor—or, in other words, a

---

[2] Although the County did not join in the motion seeking dismissal of the Doe defendants, "[a] District Court may properly on its own motion dismiss an action as to defendants who have not moved to dismiss where such defendants are in a position similar to that of moving defendants or where claims against such defendants are integrally related." *Silverton v. Dep't of Treasury*, 644 F.2d 1341, 1345 (9th Cir.), *cert. denied*, 454 U.S. 895 (1981); *see also Abagninin v. AMVAC Chem. Corp.*, 545 F.3d 733, 742–43 (9th Cir. 2008) ("As a legal matter, we have upheld dismissal with prejudice in favor of a party which had not appeared, on the basis of facts presented by other defendants which had appeared.").

municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691. A municipality can only be held liable for injuries caused by the execution of its policy or custom or by those whose edicts or acts may fairly be said to represent official policy. *Id.* at 694.

A plaintiff can demonstrate the existence of an unlawful municipal policy by presenting evidence of: (i) a facially unconstitutional government policy, or an unconstitutional, "longstanding practice or custom which constitutes the standard operating procedure of the local government entity"; (ii) a violation caused by an individual with final policymaking authority; or (iii) an individual with final policymaking authority ratifying a subordinate's unconstitutional action and the basis for it. *Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir. 1992); *see also Monell*, 436 U.S. at 708. After proving that one of these three circumstances exist, a plaintiff must also present evidence that the circumstance was the direct and proximate cause of the constitutional deprivation. *City of Canton v. Harris*, 489 U.S. 378, 389 (1989); *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).

Here, both the City and the County argue that they are entitled to summary judgment because there is no evidence that plaintiffs' constitutional rights were violated during the June 11, 2016 law enforcement operation. Defendants also contend that, in any event, plaintiffs have not and cannot demonstrate that the City and the County maintained any unconstitutional custom or practice, that any of the individuals involved with the June 11, 2016 operation was an official with final policymaking authority, or that an official with final policymaking authority ratified a subordinate's unconstitutional action and the basis for it in connection with the actions taken.

1. Policy, Practice, or Custom

The precise theories on which plaintiffs base their *Monell* claim are difficult to decipher. On the one hand, plaintiffs state in their opposition to the pending motion for summary judgment that they "do[] not contend the liability pursuant to the provisions of § 1983 based on an unconstitutional policy of the Defendants." (Doc. Nos. 48 at 35; 49 at 35.) On the other hand, plaintiffs make the blanket assertion that the alleged constitutional violations were the product of "policies, practices, and customs" of defendants, without identifying in what way those policies,

7

practices, and customs are deficient. (Doc. Nos. 48 at 36; 49 at 36.)

Defendants have come forward with evidence on summary judgment that they maintain policies and training related to the actions undertaken at the Jessen residence. The FCSO states that it has a policy, practice, and custom of training deputies in the use of reasonable force, search and seizure, and the use of CS tear gas, as well as other chemical agents, as well as a policy, practice, and custom of exercising only the force that is reasonable and necessary to protect the safety of its deputies or others. (Doc. No. 61-2 at ¶¶ 39, 41.) Pursuant to the FCSO's SWAT written guidelines,

> Barricaded suspects pose a significant threat to the safety of the neighborhood or area of occurrence and are a threat to the lives and citizens and law enforcement officers. The refusal to submit to arrest and exit a barricade position is indication of irrational behavior and/or violent criminal intent.

(Doc. No. 40-8 at ¶ 20.) The FCSO's SWAT written criteria further provide that the use and amount of chemical agent should be predicated upon:

> The seriousness of the offense; the threat to the community posed by the suspect; the location, size, single level or multi-level, available windows or areas for insertion of chemical agents, wind and weather, and type of chemical agent being used; the available positions and locations from which chemical agent can be deployed; the available team members that can be used to deploy the agents; the potential for injury to persons inside the location such as hostages who are elderly or under the age of twelve years; and the reaction of the suspect(s) to the agents.

(*Id.* at ¶ 24.) Moreover, "[t]he application of the appropriate amount of chemical agent shall be monitored, determine, and controlled by the SWAT Team Leader who is overseeing the application of the chemical agents." (*Id.* at ¶ 25.)

Likewise, CPD maintains various policies on the use of force, firearms and qualification, search and seizure, and hostage and barricade incidents. (Doc. No. 48-3 at ¶¶ 22–23.) In this regard, it is CPD's policy to address barricade situations with due regard for the preservation of life and the balancing of risk of injury, while obtaining the safe release of hostages, apprehending the offenders, and securing available evidence. (*Id.* at ¶ 24.) CPD's SWAT team trains 20 hours per month, and includes both internal department training—such as orientation, multi-day training, and a written manual—as well as external training through SWAT school and SWAT

8

conferences. (*Id.* at ¶¶ 29–31, 33.)

Plaintiffs do not dispute that these policies exist. Rather, the extent of plaintiffs' argument is their contention that: "The undisputed facts establish the SWAT team actions in the Jessen operation are the product of and were implemented pursuant to long standing policies, practices and customs of the Defendants SWAT and their law enforcement in such enforcement situations and circumstances." (Doc. Nos. 48 at 36; 49 at 36.) Plaintiffs state that defendants "admit to such policies" and the parties' separate statements of material facts, which reference the policies described above. (Doc. Nos. 48 at 36; 49 at 36.) Yet pointing to evidence that policies merely *exist* is insufficient for plaintiffs to meet their burden and to defeat summary judgment. Plaintiffs have failed to come forward with any evidence on summary judgment that the existing City and County policies are inadequate, or that there was a "persistent and widespread" violation of such policies amounting to an unconstitutional custom or practice. *Trevino*, 99 F.3d at 918. Indeed, plaintiffs do not even argue in opposition to the pending motion that this is the case.

To the extent that plaintiffs argue that the events of June 11, 2016 were a concocted training exercise, and that defendants had a custom or practice of "transform[ing] benign circumstances . . . into a full-scale, massive, military-like training session for the Fresno County Sheriff's Department and the Clovis Police Department" (Doc. No. 1-1, Ex. A at ¶ 19), plaintiffs' conclusory argument is unsupported by any evidence whatsoever. In deeming the June 11, 2016 law enforcement operation a "training exercise" plaintiffs rely solely on an exhibit to the deposition of Clovis Police Corporal Curtis Shurtliff. (Doc. No. 48-10 at 466.) Plaintiffs contend that this exhibit, the "SWAT After Action Report," indicates that the reason for the operation was "Out of town training." (*Id.*; Doc. No. 48-1 at ¶¶ 258, 261.) Plaintiffs, however, have completely mischaracterized what this portion of the exhibit in fact shows:

| TEAM MEMBERS NOT PRESENT: | REASON: |
|---|---|
|  | Out of town training |
|  |  |
|  |  |

/////

Viewing this exhibit in context, it is apparent that "Reason: Out of town training" is offered on the form as an explanation for the absence of any team member(s) at the scene. The City contends the identities of the absent team members was inadvertently omitted from the report. (Doc. No. 60 at 4–5.) Indeed, and as plaintiffs concede, immediately below the chart indicating "Reason: Out of town training," the report states: "TRAINING ONLY: NO." (Doc. No. 48-1 at ¶ 262.) Moreover, the County has submitted the sworn declarations of Lieutenant Alexander, Sergeant Dutrow, Lieutenant Woodrum, and Deputy Pulkownik, in which each attest that actions taken by law enforcement personnel at the Jessen residence were not pursuant to a training exercise. (Doc. Nos. 40-8 at ¶ 11, 40-6 at ¶ 12, 40-7 at ¶ 18, and 40-5 at ¶ 15.) Lieutenant Alexander's declaration moreover attests that the FCSO does not have a custom, policy, or practice of turning a barricaded subject in a private residence into a training exercise for its SWAT personnel or any other personnel. (Doc. No. 40-8 at ¶ 17.) Plaintiffs dispute and object to this evidence,[3] but provide no evidence to the contrary. Instead, plaintiffs merely cite to deposition testimony that the FCSO and CPD SWAT teams *at times* train and work together on joint operations. (Doc. No. 48-1 at ¶ 230.) This evidence relied upon by plaintiffs is simply not evidence sufficient to raise a triable issue of fact as to whether the June 11, 2016 operation was a training exercise.

Fatal to plaintiffs' argument is that, even if the court were to accept as true that the operation at the residence was merely a law enforcement training exercise, plaintiffs have come forward with no evidence that defendants did so pursuant to a policy, custom, or practice. In order for a municipal entity to be liable under § 1983 for a custom or practice, the custom or practice in question must be so "persistent and widespread" that it constitutes "permanent and well-settled city policy." *Trevino*, 99 F.3d at 918. Evidence of a single constitutional violation is ordinarily insufficient to establish a longstanding practice or custom. *Gant v. County of Los*

---

[3] Plaintiffs object to large swaths of these sworn declarations on various grounds, including inadmissible opinion, conclusions not constituting evidentiary facts, speculation, lack of personal knowledge, and lack of foundation. (*See* Doc. Nos. 49-8, 49-10, 49-11, 49-12.) Plaintiffs, however, have provided no basis upon which the court to find that any of these officers would lack foundation or personal knowledge regarding the objectives of the June 11, 2016 operation or the FCSO's policies generally. Plaintiffs' objections are therefore overruled.

*Angeles*, 772 F.3d 608, 618 (9th Cir. 2014); *Christie v. Lopa*, 176 F.3d 1231, 1235 (9th Cir. 1999); *Davis v. City of Ellensburg*, 869 F.2d 1230, 1233–34 (9th Cir. 1989); *see also Trevino*, 99 F.3d at 918 (explaining that evidence of "sporadic incidents" is insufficient to establish municipal liability under § 1983).

Plaintiffs also argue that defendants maintained a custom or practice of failing to obtain a search warrant when a resident refuses to give consent to search or when exigent circumstances do not exist. (*See* Doc. No. 61-2 at ¶¶ 43–44.) However, this bald contention is also unsupported by any evidence. Plaintiffs cite to the deposition of David Jessen, in which he testified that law enforcement asked him for the key to his residence, as well as the depositions of law enforcement officers on the scene in which they testified that a search warrant was not obtained for the June 11, 2016 operation. (Doc. No. 61-2 at ¶ 44.) Plaintiffs also cite to the deposition of Lieutenant Alexander, who testified that it is customary during SWAT operations to obtain a search warrant if officers have time to do so, but that "[i]f they're exigencies, like there were in this case, then we will continue to work towards apprehension under the exigency exception, but we do seek a search warrant." (*Id.*)

Though the parties do not dispute that a search warrant was not obtained here, none of the evidence cited by plaintiffs raises a triable issue of fact as to whether defendants maintained a *custom or practice* of failing to obtain a search warrant when consent or exigent circumstances are lacking. Even assuming for the sake of argument that the officers' failure to seek and obtain a search warrant before advancing in this case was unconstitutional, plaintiffs have identified no other similar incidents in which defendants failed to obtain a search warrant sufficient to establish a custom or practice. *Trevino*, 99 F.3d at 918.

Pressed by the court at the hearing on the pending motions as to what policies or practices underlie plaintiffs' claims, plaintiffs' counsel raised for the first time a different theory of liability—that defendants lacked any policy with respect to the deployment of tear gas, and that the lack of policy essentially gave the officers unfettered discretion to use tear gas at the Jessens' home. It is true that in certain circumstances, a local government's failure to train or supervise employees may rise to the level of official government policy sufficient to support municipal

11

liability under § 1983. *Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992) (stating that a local government entity may violated § 1983 if it has a "policy of inaction and such inaction amounts to a failure to protect constitutional rights"); *see also Gant*, 772 F.3d at 618 (a plaintiff must show the government's "omission amounts to deliberate indifference"). A pattern of similar constitutional violations by untrained employees is "ordinarily necessary" to demonstrate a persistent and widespread municipal policy of inadequate training. *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 409 (1997). Moreover, a municipality can only be liable under § 1983 for a policy of inadequate training when the failure to train is deliberately indifferent, that is, where the failure to train reflects a deliberate or conscious choice. *City of Canton*, 489 U.S. at 389–91, 407 (stating that "when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program"); *Mortimer v. Baca*, 594 F.3d 714, 716 (9th Cir. 2010) (a local government may be liable where it has a policy of inaction amounting to a failure to protect constitutional rights).

The court notes that a *Monell* theory based on a policy of inaction or failure to train was not articulated in plaintiffs' oppositions to the pending defense motions for summary judgment.[4] At the hearing on the present motions, counsel for plaintiffs advanced this new theory of liability

---

[4] On the contrary, in their oppositions plaintiffs repeatedly argued that policies, practices, and customs dictated defendants' conduct here. (*See, e.g.*, Doc. No. 49 at 35–36) ("Here, it is apparent, expressly and inferentially, that Defendants' SWAT policies, practices and customs in the Jessen operation were of long term duration, frequency, and consistency and supported by frequent training that such SWAT activities became the policy, guidelines and traditional method of carrying out established law enforcement operations in the use of SWAT enforcement activities."); *id.* at 36 ("Defendants' law enforcement and SWAT policies, practices and customs were not implemented, or predicated on isolated or sporadic incidents, but undertaken pursuant to well-established, long term written policies, practices and customs and training to be executed and implemented in law enforcement operations and specifically SWAT operations including the Jessen operation and all such operations where similar conditions existed."); *id.* ("The undisputed facts establish the SWAT team actions in the Jessen operation are the product of and were implemented pursuant to long standing policies, practices and customs of the Defendants SWAT and their law enforcement in such enforcement situations and circumstances. The Defendants admit to such policies.")).

12

based solely on deposition testimony of Lieutenant Woodrum, in which he was asked:

> Q: Does Fresno County Sheriff have a policy and procedure, directive, SOP, whatever you want to call it, relating to the deployment of tear gas, storage, and that type of thing?
>
> A: No.

(Doc. No. 48-1 at ¶ 195; Doc. No. 49-1 at ¶ 195.)

Even considering this excerpt of Woodrum's deposition, the court is not persuaded that it stands for the proposition plaintiffs put forth. The reference in the question put to the lieutenant to "tear gas, storage, and that type of thing" is perplexing because "tear gas" and "storage" would appear to refer to separate issues. The court has reviewed the entirety of Lieutenant Woodrum's deposition, and there were no follow-up questions regarding an FCSO policy, or lack thereof, with respect to the deployment of tear gas. Moreover, plaintiffs' belated assertion that Lieutenant Woodrum answer of "no" to this vague question put to him at deposition raises a triable issue of material fact regarding the lack of a policy for deployment of tear gas is belied by plaintiffs' own oppositions to the pending motions. There, plaintiffs do not cite to that answer in their oppositions.[5] To the contrary, plaintiffs' oppositions actually identify various FCSO policies related to the deployment of tear gas, including: "Use only that force which is reasonable"; "Respect both private and public property at all times when deploying chemical agents"; "Every reasonable effort at diffusing a situation should be considered before deploying chemical agents"; and "Use chemical agents in a progressive escalation of weaponry." (Doc. No. 48 at 16–17; Doc. No. 49 at 16.) In those oppositions plaintiffs argue that "[t]hese policies were ignored in their implementation and execution at the Jessen residence." (Doc. No. 48 at 17; Doc. No. 49 at 16.)

In any event, even construing plaintiffs' *Monell* theory as one of failure to train, defendants are entitled to summary judgment in their favor because plaintiffs have failed to provide any evidence of a pattern of similar violations, or any evidence otherwise indicating

---

[5] This deposition testimony is cited as fact #195 of 420 in plaintiffs' separate statement of additional facts (Doc. No. 48-1 at ¶ 195; Doc. No. 49-1 at ¶ 195), but is not otherwise referenced in plaintiffs' opposition briefs. *See Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001) ("The district court need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found.").

13

deliberate indifference.  Although plaintiffs allude to "all such operations where similar conditions existed," they describe none.  (Doc. No. 48 at 36; Doc. No. 49 at 36.)  Plaintiffs simply rely on the decision in *McRorie v. Shimoda*, 795 F.2d 780 (9th Cir. 1986), for the proposition that a custom can be inferred from one incident or related incidents occurring on one day.  (Doc. No. 48 at 36, Doc. No. 49 at 36.)  This argument, however, misconstrues *McRorie*'s holding.  In that case, the plaintiff had alleged that guards seriously injured him and 28 other prisoners during a shakedown.  795 F.2d at 784.  The Ninth Circuit held that, "[i]f proved, these acts reflect a disposition to disregard human life and safety so prevalent as to be . . . policy or custom." *Id.* (internal citation and quotation marks omitted).  Accordingly, the Ninth Circuit reversed in part the district court's dismissal of the suit for failure to state a claim.  Here, in contrast, the case is before the court on defendants' motions for summary judgment and plaintiffs have failed to produce any evidence at this stage of the litigation that the alleged constitutional violations occurred at any other time or to any other person.  Having failed to do so, they cannot defeat summary judgment.  Given the lack of evidence of other violations, the court cannot conclude that the need for a particular policy, or the need for more or different training, was so obvious, and the inadequacy so likely to result in a violation of constitutional rights, that the City and the County can be said to have been deliberately indifferent.  *City of Canton*, 489 U.S. at 390; *Castro v. County of Los Angeles*, 833 F.3d 1060, 1076 (9th Cir. 2016).

    2. <u>Official Policymaker or Ratification</u>

  Defendants move for summary judgment on the additional ground that there is no evidence that an official policymaker authorized or ratified the June 11, 2016 law enforcement operation, or otherwise established or ratified a policy or practice of authorizing "military-like, thinly disguised SWAT training exercises."  (Doc. No. 40-1 at 27–28.)  Plaintiffs argue that "sufficient facts are presented to raise a question of fact as to whether Lt. Alexander and Lt. Gomez have final policy making authority on the policies, customs, and practices in their position of commander of their respective SWAT teams."  (Doc. Nos. 48 at 38; 49 at 37–38.)  Plaintiffs further argue that, if Lieutenants Alexander and Gomez are official policymakers, "it is clear they approved the actions of their subordinates in the Jessen action," and that this raises triable issues

14

of fact as to ratification. (Doc. Nos. 48 at 38; 49 at 38.)

A municipality can be liable for an isolated constitutional violation when the person causing the violation has final policymaking authority. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988). "[W]hether a particular official has 'final policymaking authority' is a question of state law." *Id.* at 138; *Lytle v. Carl*, 382 F.3d 978, 982 (9th Cir. 2004) ("To determine whether a school district employee is a final policymaker, we look first to state law."). The fact that a particular official has discretion to make final decisions for a municipality under state law does not, without more, give rise to municipal liability. *See Ulrich v. City and County of San Francisco,* 308 F.3d 968, 985 (9th Cir. 2002); *Gillette*, 979 F.2d at 1349; *Hansen v. City of San Francisco*, No. 12-cv-04210-JST, 2014 WL 1310282, at *7 (N.D. Cal. Mar. 31, 2014) ("The fact that a city employee has independent decision-making power does not render him a final policymaker for purposes of municipal liability."). For a municipality to be liable under § 1983 based on a theory of ratification, a plaintiff must show that an individual with final policymaking authority ratified a subordinate's unconstitutional action and the basis for that action. *Gillette*, 979 F.2d at 1348.

Plaintiffs argue in conclusory fashion that Lieutenant Alexander of the FCSO and Lieutenant Gomez of the CPD constitute official policymakers for purposes of *Monell* liability, because they "adopted and ordered the well-established SWAT policies, customs and practices to be utilized in the Jessen operation and made all of the final decisions executed and implemented in a SWAT operation." (Doc. No. 49 at 36.) Yet plaintiffs cite no provision of state law in support of this proposition. *See Praprotnik*, 485 U.S. at 138. Instead, the only evidence plaintiffs rely upon on this point is the deposition testimony of Lieutenant Alexander and other officers stating that Lieutenant Alexander was the "SWAT lieutenant in charge" of the operation at the residence. (Doc. No. 48-1 at ¶¶ 56, 158, 247). Plaintiffs cite no evidence at all with respect to their contention that Lieutenant Gomez was an official policy maker. Even accepting as true that Lieutenant Alexander was in charge at the scene of the June 11, 2016 law enforcement operation, the mere fact that he led this particular operation is not evidence that he possessed authority to make final policy on behalf of the County. To conclude otherwise would be the imposing of

vicarious liability, for which a public entity cannot be held liable under § 1983. *See Praprotnik*, 485 U.S. at 126 (cautioning that "[i]f the mere exercise of discretion by an employee could give rise to a constitutional violation, the result would be indistinguishable from *respondeat superior* liability."). Because plaintiffs have failed to present any evidence on summary judgment that Lieutenant Alexander or Lieutenant Gomez constituted final policymakers for the County or City, respectively, plaintiffs' official policymaker and ratification theories both fail to survive summary judgment.

Plaintiffs have failed to establish a triable issue with respect to any of their theories of liability under *Monell*.[6] Based on the undisputed evidence before the court, the City and the County are entitled to summary judgment in their favor with respect to plaintiffs' *Monell* claim.

**C.  Negligence Claim**

Defendants next move for summary judgment on plaintiffs' negligence cause of action on the grounds that they are entitled to state law immunity under California Government Code § 820.2. (Doc. Nos. 40-8 at 28–30; 41 at 24.) That provision states that "a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused." Cal. Gov. Code § 820.2. "To determine which acts are discretionary, California courts do not look at the literal meaning of 'discretionary,' because '[a]lmost all acts involve some choice between alternatives.'" *Martinez v. City of Los Angeles*, 141 F.3d 1373, 1379 (9th Cir. 1998) (quoting *Caldwell v. Montoy*, 10 Cal. 4th 972, 981 (1995)). Instead, this immunity protects "basic policy decisions," but not "'operational' or 'ministerial' decisions that merely implement a basic policy

---

[6] In their oppositions to the pending summary judgment motions, plaintiffs request that the court take judicial notice of: (1) an "amended claim for damages" filed by the Jessens with the County, dated November 17, 2016; (2) the County's notice of rejection of plaintiffs' claim, dated September 13, 2016; (3) the County's second notice of rejection of plaintiffs' claim, dated December 28, 2016; (4) an "amended claim for damages" filed by the Jessens with the City, dated November 17, 2016; and (5) the City's notice of rejection of plaintiffs' claim, dated December 15, 2016. (Doc. Nos. 48-2; 49-3.) At the hearing on these motions, however, counsel for plaintiffs represented to the court that these documents were relevant only to show plaintiffs' administrative exhaustion, and not whether plaintiffs have raised a triable issue of fact with respect to *Monell* liability. In light of the court's ruling here, plaintiffs' requests for judicial notice will be denied as moot.

16

decision." *Id.* (quoting *Johnson v. State*, 69 Cal. 2d 782, 796 (1968)).

Plaintiffs contend that whether or not a public employee can be liable for an injury resulting from the exercise of his discretion under § 820.2 and whether or not immunity applies "are clearly questions of fact, and certainly when the totality of circumstances is considered." (Doc. Nos. 48 at 39; 49 at 39.) But plaintiffs proffer not a single fact nor any evidence in support of their argument that § 820.2 is inapplicable here. Rather, plaintiffs merely contend that "[e]vidence in this case establishes such liability," but cite to no evidence or authority. (Doc. No. 48 at 40; 49 at 40.)

Defendants, for their part, cite the decision in *Conway v. County of Tuolumne*, a California Court of Appeal case that is instructive in this regard. (Doc. Nos. 41 at 24; 61 at 9–10.) In *Conway*, the plaintiff brought claims for negligence, nuisance, trespass, and strict liability for an ultrahazardous activity against the county. 231 Cal. App. 4th 1005, 1011 (2014). There, the county's SWAT team was called to plaintiff's residence in an attempt to extricate an armed suspect who had barricaded himself in plaintiff's home. *Id.* at 1010. After unsuccessful attempts to remove the suspect, SWAT officers fired tear gas into the plaintiff's residence, rendering the home uninhabitable. *Id.* at 1010–11. Deeming the matter one of first impression, the California Court of Appeal for the Fifth Appellate District concluded that pursuant to Government Code §§ 820.2 and 815(b), the county was immune from liability on all of plaintiff's claims. In so holding, that court found that the effectuation of the suspect's arrest, and in particular the decision to use tear gas, was not a ministerial but a discretionary decision:

> Here, once the officers decided to arrest Donald, they were vested by the Department with discretion to determine the means by which the arrest should be carried out. This discretion included the possible use of tear gas as a way to determine whether Donald was in George's house. The officers exercised their discretion by observation and listening. As our Supreme Court has noted: "The decision, requiring as it does, comparisons, choices, judgments, and evaluations, comprises the very essence of the exercise of 'discretion' and we conclude that such decisions are immunized under section 820.2." . . . In this case, the decision to use tear gas resulted from choices and judgments made in response to changing circumstances; it was not made in blind obedience to orders.

*Id.* at 1018–19 (internal citation omitted).

The court finds no meaningful distinctions between the circumstances confronted by the court in *Conway* and the present case, and plaintiffs offer none. The City and the County are therefore also entitled to summary judgment in their favor with respect to plaintiffs' negligence claim.

**D.     Plaintiffs' Local Rule 133(j) Objection**

Plaintiffs separately argue in their oppositions that defendants' motions for summary judgment should be denied due to defendants' failure to comply with Local Rule 133(j). (Doc. Nos. 48-4; 49-4.) Local Rule 133(j) provides:

> Depositions shall not be filed through CM/ECF. Before or upon the filing of a document making reference to a deposition, counsel relying on the deposition shall ensure that a courtesy hard copy of the entire deposition so relied upon has been submitted to the Clerk for use in chambers. Alternatively, counsel relying on a deposition may submit an electronic copy of the deposition in lieu of the courtesy paper copy to the email box of the Judge or Magistrate Judge and concurrently email or otherwise transmit the deposition to all other parties. Neither hard copy nor electronic copy of the entire deposition will become part of the official record of the action absent order of the Court. Pertinent portions of the deposition intended to become part of the official record shall be submitted as exhibits in support of a motion or otherwise. *See* L.R. 250.1(a).

Plaintiffs contend that each defendant "did not and has not provided Plaintiffs (electronically or courtesy paper copy) the deposition transcripts Defendant is 'relying on' within its Motion for Summary Judgment or, in the Alternative, Summary Adjudication," and that on this basis, the motions "should be summarily dismissed." (Doc. Nos. 48-4 at 1–2; 49-4 at 1–2.)

On November 20 and 21, 2018, subsequent to the filing of plaintiffs' oppositions to the pending motions, defendants filed notices of lodging deposition transcripts with the court. (Doc. Nos. 55, 57.) Moreover, the City filed a response to plaintiffs' objection pursuant to Local Rule 133(j), which the County joined. (Doc. Nos. 56, 59.)

Plaintiffs' objection, brought pursuant to Local Rule 133(j), is meritless. First, plaintiffs' objections appear to be based on a misreading of the local rule. Contrary to plaintiffs' argument that defendants provided them neither a paper nor electronic copy of the deposition transcripts in question, "Local Rule 133(j) does not require defendant to send plaintiff a copy of the entire deposition if the entire deposition was submitted to the court in hard copy." *Woodson v. Sahota*,

No. 2:11-cv-1589 MCE KJN P, 2016 WL 758722, at *3 (E.D. Cal. Feb. 26, 2016); *see also Boyd v. Etchebehere*, No. 1:13-01966-LJO-SAB (PC), 2017 WL 1632887, at *1 (E.D. Cal. May 1, 2017). Second, to the extent that defendants failed to provide the court with paper copies of the entire deposition transcripts before or upon the filing of their motions for summary judgment, defendants thereafter lodged paper copies of the deposition transcripts with the court (s*ee* Doc. Nos. 55, 57), and have otherwise complied with Local Rule 133(j) by attaching the pertinent portions of depositions as exhibits to their motions. Finally, plaintiffs have not shown, nor have they contended, that they were prejudiced by defendants' purported non-compliance with the local rule. *See Barry v. Bishop*, 623 Fed. App'x 436, 438 n.10 (9th Cir. 2015) ("To the extent that Barry now asserts that we should reverse for an alleged violation of Eastern District of California Local Rule 133(j), we disagree. . . .. Barry has not shown any prejudice arising from the claimed violation.").[7] Accordingly, plaintiffs' objection pursuant to Local Rule 133(j) is overruled.

## CONCLUSION

For the reasons set forth above:

1. The Doe defendants are dismissed from this action;
2. Defendants' motions for summary judgment (Doc. Nos. 40, 41) as to all of plaintiffs' claims are granted;
3. The Final Pretrial Conference scheduled for January 28, 2019 and the Jury Trial scheduled for March 19, 2019 are vacated; and
4. The Clerk of the Court is directed to enter judgment in favor of defendants and close this case.

IT IS SO ORDERED.

Dated: **January 5, 2019**

UNITED STATES DISTRICT JUDGE

---

[7] Citation to this unpublished Ninth Circuit opinion is appropriate pursuant to Ninth Circuit Rule 36-3(b).