C. Russell Georgeson, Esq. 53589
Richard A. Belardinelli, Esq. 065168
GEORGESON AND BELARDINELLI
7060 N. Fresno Street, Suite 250
Fresno, California 93720
Telephone: (559) 447-8800
Facsimile: (559) 447-0747


Attorneys for Plaintiffs, DAVID JESSEN and GRETCHEN JESSEN

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| DAVID JESSEN AND GRETCHEN JESSEN,<br><br>        Plaintiffs,<br><br>    vs.<br><br>THE COUNTY OF FRESNO, CITY OF CLOVIS and DOES 1 to 100, Inclusive,<br><br>        Defendants. | Case No.: 1:17-CV-00524-DAD-EPG<br><br>**DECLARATION OF RICHARD A. BELARDINELLI IN IN OPPOSITION TO DEFENDANT CITY OF CLOVIS MOTION FOR ATTORNEYS FEES**<br><br>**DATE: 3/5/19**<br>**TIME: 9:30 a.m.**<br>**DEPT: Courtroom 5** |

I, Richard A. Belardinelli, declare as follows:

1.      I am an attorney with the law firm of Georgeson and Belardinelli duly licensed to practice before all Courts of the State of California and in the United States District Court for the Eastern District of California. I am one of the attorneys of record for Plaintiffs, David Jessen and Gretchen Jessen, in the above-entitled matter.

2.      The following facts are of my personal knowledge and if called as a witness, I could competently testify thereto.

3.      In support of Plaintiffs' Opposition to City of Clovis' ("Clovis") Motion for Attorneys' Fees, Plaintiffs, David and Gretchen Jessen ("Plaintiffs") have attached, as **Exhibit 1,**

1   a summary of Plaintiffs' Statement of Facts upon which they relied in opposing Clovis' Motion.

2   Such statements were considered and applied in determining the viability and validity of

3   pursuing the §1983 cause of action and refuted factually Clovis' claim the §1983 action was

4   frivolous of expert designation.

5       4.      Plaintiffs do not dispute Clovis is the prevailing party in this action, but disputes

6   its contention that Plaintiffs' lawsuit against the City became frivolous after the close of fact

7   discovery or after expert disclosure.  It is noted that although the Defendant County of Fresno

8   prevailed on its motion for summary judgment, but the County has not sought attorneys' fees

9   from the Jessens. Apparently, on the same law and evidence asserted by Plaintiffs against both

10  County and Clovis, the County does not view the Plaintiffs' action was unfounded, frivolous,

11  meritless or vexatious after the close of fact discovery or expert disclosure.

12      5.      While Clovis describes discovery pleadings in support of its motion, such

13  documentation does not provide a factual basis establishing the Plaintiffs' actions after fact

14  discovery or expert disclosure demonstrated the action was frivolous.  Similarly, referencing the

15  Court's nineteen (19) page ruling granting the summary judgment does not demonstrate the

16  action was frivolous after discovery disclosure as the term is understood.

17      6.      Plaintiffs filed the §1983 action based upon a substantial body of facts, disputed

18  and undisputed, and legal principles that were applied, rightly or wrongly on Plaintiffs' good

19  faith belief established a viable *Monell* liability action.  Clovis does not contend its filing was

20  frivolous.  Here, Clovis has failed to establish Plaintiffs' §1983 action is or was frivolously

21  continued by admissible evidence or legal support.

22      7.      Clovis does not contend or argue the three (3) other "separate grounds" in

23  support of its motion for an award of attorney fees, namely that Plaintiffs' §1983 action is

24  "unfounded," "meritless" or that the "arguments are wholly without merit."  Lacking such

25

26

27

28

1    contentions or arguments, it would appear Defendant's contention that the continued action was

2    frivolous is without support by implication.

3         8.    In any event, the focus of considerations in this motion is necessarily, as a matter

4    of due process, directed to the meaning and application of the term "frivolous" in determining

5    whether to award attorney fees.

6         9.    Applying such definitions here, coupled with Plaintiffs understanding of the law

7    and the substantial and complex number of factual circumstances, confirms Plaintiffs' §1983

8    action at the time of filing and continued through the summary judgment was not "frivolous"

9

10   when the term is applied in its ordinary and popular meaning.  Plaintiffs' continued pursuit of

11   the action was in accordance with their understanding of *Monell* liability under the facts and

12   circumstances discussed below, and the overwhelming factual circumstances that Plaintiffs

13   believed and understood resulted in Constitutional Deprivations.

14        10.    In Plaintiffs' initial and continuing analysis as to the validity of Clovis'

15   liability under §1983 at the time of filing and following expert witness designation, a primary

16   consideration and determination was made to determine whether the policies, customs, and

17   practices of the FCSO SWAT operation were also applicable to the actions of the CPD SWAT

18   Team undertaken in their "joint" SWAT operation at the Jessen residence.  A resolution of this

19   issue was considered relevant to Clovis' §1983 liability arising from the operation.

20        11.    Plaintiffs' considerations in resolving this issue included the fact that CPD and

21   FCSO trained together monthly in the two years preceding the Jessen incident and regularly

22   thereafter in performing its joint SWAT operations (See Decl. of Richard A. Belardinelli ("RAB

23   Decl.) ¶3, attachment No. 1, No. 74);  CPD implemented FCSO policies, customs and practices

24   in the Jessen operation in execution of its responsibilities as assigned and instructed by the

25   commander of the FCSO SWAT team, Lt. Alexander, ("RAB Decl.) ¶3, attachment No. 1, Nos.

26   56, 158, 160), and that CPD's "integral participation" in numerous joint **actions** at the Jessen

27

28

1 operation that were based on FCSO policies, customs and practices that the FCSO and CPD

2 trained for jointly, and followed in the execution and implementation of the Jessen joint SWAT

3 operation the Jessen residence. ("RAB Decl.) ¶3 , attachment No. 1, Nos. 186, 189, 192, 193).

4    12.    Because the actions of the Defendants' SWAT teams were considered

5 completely intertwined and an obvious "joint" SWAT operation, it was reasonable for Plaintiffs

6 to determine and appropriately conclude the policies, customs, and practices of the FCSO

7 applied to CPD SWAT in judging CPD's actions, and grounds for its liability in its execution

8 and implementation of FCSO policies, customs and practices in the Jessen action.

9

10    13.    Plaintiffs also analyzed and considered the policies, customs and practices of

11 CPD SWAT team that were executed and implemented in the Jessen operation in judging its

12 §1983 liability.

13    14.    The "integral participation" of the CPD SWAT team in the Jessen operation and

14 its execution and implementation of FCSO policies, custom and practices therein as well as its

15 own was appropriately considered by Plaintiffs, in assessing whether the Plaintiffs' continuation

16 of this action after expert discovery was frivolous.

17

18    15.    Based on the facts and legal principles, Plaintiffs reasonably concluded and

19 believed that as an "integral participant" in the Jessen operation, Clovis would be subject to

20 liability for the violation of Jessens' constitutional rights and judged collectively with the

21 actions of the FCSO SWAT team and the execution and implementation of the policies,

22 customs and practices. (*Boyd v. Benton County* 374 F.3d 773, 780 (9th Cir. 2004); See also

23 *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978) ["A person 'subjects' another to the

24 deprivation of a constitutional right, within the meaning of section 1983 if he . . . participates in

25 another's affirmative acts . . ."]

26    16.    Rightly or wrongly, Plaintiffs considered the policies, customs and practices of

27 the FCSO to be equally applicable to the actions of the CPD and their conduct judged thereby

28

1    and applied such policies, customs and practices in analyzing Clovis' Constitutional liability in

2    filing and continuing to pursue the action after expert disclosure.    With this understanding,

3    Plaintiffs filed their complaint.

4         17.    Plaintiffs filed their action in Fresno County Superior Court on March 8, 2017

5    alleging three (3) causes of action against Clovis and the County of Fresno ("Fresno") as

6    defendants.  The complaint alleges three causes of action:  (1)  First cause of Action for a cause

7    of action based on Title 42 U.S.C. §1983 for alleged violations of Jessens' rights under the

8    Fourth, Fifth, and Fourteenth Amendment (Complaint, pp. 12-16); (2) negligence (Complaint

9    pp. 16-17) and (3) violation of Article 1, sections 1, 7, and 13 of the California Constitution.

10   (Complaint, p. 17). Defendants removed the action to the federal court.

11

12        18.    A substantial factor considered by Plaintiffs in filing the §1983 claim was the

13   consideration and application of the substantial undisputed **direct** evidence of the factual

14   circumstances of the Jessen SWAT action.    Plaintiffs' analysis of the extensive, complex

15   evidence that was possessed by Plaintiffs before the action was filed as well as after the filing of

16   the Jessen complaint concluded and determined that the factual circumstances of this massive

17   SWAT response by Defendants established Defendants by a preponderance of the evidence

18   engaged in unconstitutional actions that resulted in a deprivation of the Jessens' Constitutional

19   right granted in the fourth, fifth, and fourteenth Amendments.

20

21        19.    The violation of Constitutional Amendments is minimally addressed inasmuch as

22   it is clear that the Court's summary judgment is based on the Supreme Court's *Monell* opinion

23   and the limitations therein to a §1983 action.

24        20.    In addition, substantial, admissible "circumstantial" evidence was considered by

25   Plaintiffs supportive of a §1983 action, the satisfaction of the elements required for *Monell*

26   liability that would be of substantial probative value for a Jury's consideration.

27

28

21.     For example, the size of the force, the mass use of equipment, the helicopter, the incident log which every witness for CPD SWAT testified was "accurate" that noted the Jessen operation was a training mission to arrest a homeless person who peaceably vacated an adjacent residence, as wells as many other conclusions and inferences arising from admissible evidence that the Jessen SWAT operation was a training mission were reasonable, but rejected and decided by the Court in a manner favoring moving parties that the "accurate" CPD incident log training comment was taken out of context.

22.     Although somewhat addressed by the Court in its ruling, rightly or wrongly, Plaintiffs considered and understood the totality of the evidence, direct and circumstantial, as to Defendants SWAT action **to constitute and represent Defendants' "execution and implementation" of CPD and FCSO official policy and/or customs, that inflicted Constitutional injury on the Jessens.**

23.     Plaintiffs considered the Defendants SWAT teams' execution and implementation of the operation focusing on the **action taken at the Jessen operation** to constitute the execution of Clovis and the County of Fresno's policies and customs implemented by CPD and FCSO SWAT Teams.  Numerous witnesses confirmed the Jessen SWAT action was implemented, executed, and emanated from the official policies, customs, and practices.  Additionally, witnesses confirmed to Plaintiffs' satisfaction that the acts could "fairly" be said to represent "official" policies and long term customs required and utilized in SWAT operations performed in Defendants joint training, and jointly engaged in regularly.

24.     The rulings of other cases address the issues that exist in bringing a *Monell* §1983 liability action that appeared to Plaintiffs to establish the test for establishing *Monell* liability.  For example, in *Los Angeles County, Cal v. Humphries,* 562 U.S. 29 (2010), the Supreme Court asks with respect to *Monell* "what acts are the municipality's own for purposes of liability" and is understood by Plaintiffs to answer in 131 S.Ct. 447, 448,

> "The Court held that 'a municipality cannot be held liable' solely for the acts of others, e.g. '*solely* because it employs a tortfeasor (cite), but it may be held liable **'when execution of a government's policy or custom . . . inflicts the injury."** (Emphasis added).

The Court further amplifies on the application of *Monell* that Plaintiffs relied upon in bringing and continuing the Jessens' action in p. 448,

> "Thus, as *Monell* explicitly stated, '[l]ocal governing bodies. . . can be sued directly under §1983 for monetary, declaratory, or injunctive relief where, as here, the **action that is alleged to be unconstitutional implements or executes a policy or custom."** (Emphasis added).

25.     Thus, Plaintiffs belief and understanding, whether correct or incorrect, is that in the consideration of *Monell* liability, it is **the requirement that the unconstitutional action executed and implemented** must **ensue** by reason of a policy or custom that may or may not be Constitutional.   Plaintiffs believed and understood that they were required to establish that Clovis **had a deliberate policy, custom, or practice that was the 'moving force' behind the constitutional violation. . .".**  (*Monell,* 436 U.S. at 694-695)

26.     Here, the witnesses, and the Court in its Summary Judgment Order found that FCSO and CPD had presented evidence "that they maintain policies and training related to the actions undertaken at the Jessen residence." (See Court's Order, p. 8:2-8 & p.8: 22 – p. 9:1).

27.     Plaintiff reasonably concluded that the action taken in the Jessen operation was the product of CPD and FCSO policies custom, or practices that was executed and implemented in the Jessen operation (Court Order, p. 8) and therefore satisfied the requirements for *Monell* liability.  Plaintiffs understood that policies were not required to be unconstitutional policies **on their face** to impose *Monell* 1983 liability, but simply the "moving force" in taking action. Simply stated,  Plaintiffs understanding was that liability would ensue in a situation **where the action that is alleged to be unconstitutional evolves** from a policy, custom, or practice that is simply implemented or executed in an unconstitutional manner and inflicts injury whether the

policy or custom from which the action arises is constitutional or not. This is the factual and legal argument Plaintiffs attempted to make, but apparently failed to do so. However, this understanding of *Monell* liability is not frivolous and was sincerely presented.

28.    The Court's Order express the principle that to establish "unlawful municipal liability," Plaintiffs must establish at least one of three circumstances, then causation. (Order, p. 7:5-14). Plaintiffs researched and relied upon in Ninth Circuit cases that appear in many instances to state the situations to impose *Monell* liability in different, modified and various ways than those relied upon by the Court. Plaintiff reasonably and in a good faith belief considered, and to some extent relied upon, other legal authority as to what is characterized as "*Monell* Liability" and used such cases to determine *Monell* parameters.

29.    For example, Plaintiffs relied upon principles in in *Lytle v. Carl* (9th Cir. 2004) 382 F.3d 978, 982, in analyzing the viability of *Monell* liability action. In *Lytle,* supra, the Court states that §1983 Plaintiffs can establish municipal liability on any of three theories:

> (1) that a district employee was acting pursuant to an expressly adopted official policy; (2) that a district employee was acting pursuant to a longstanding practice or custom; or (3) that a district employee was acting as a "final policymaker."

30.    Plaintiffs focused their argument and reliance on the first two situations imposing *Monell* liability and considered the facts and circumstances of the operation, the acknowledgment and testimony of the SWAT members undertaking the Jessen operation that their operation and actions were pursuant to FCSO and CPD policies, customs, and practices. Based thereon, rightly or wrongly, Plaintiffs considered the necessary situations for *Monell* liability were supported by substantial evidence as well as legal principles applicable to *Monell.*

31.    In September of 2018, Plaintiffs determined the situations for imposition of *Monell* liability outlined in *Lytle v. Carl* (9th Cir. 2004) 382 F.3d 978, 982 were confirmed by the Ninth Circuit in *Barone v. City of Springfield, Oregon* (9th Cir. 2018) 902 F.3d 1091,

1  1106–1107 which similarly described the means to achieving *Monell* liability. Plaintiff

2  understood to establish a §1983 *Monell* liability claim it need only establish the FCSO and

3  CPD SWAT team were acting pursuant to, or as authorized under, official policy or custom

4  which the factual circumstances undisputedly establish.    Here, there can be no doubt this

5  conclusion was satisfied in the Jessen operation.

6      32.    The SWAT operations of Defendants, was as a matter of common sense and

7  knowledge, was not a transient vigilante group engaging in SWAT operations or a random

8  mission having no basis in policy, custom, or practices. Rather, it was an authorized law

9  enforcement unit organized, authorized, and existing under Clovis and County of Fresno SWAT

10  team authorizations, policies, and customs which engaged in the SWAT operation and executed

11

12  their **actions** as authorized by municipal policies, customs, and practices...

13      33.    A relevant conclusion is noted in the Court's order in p. 8:2 to 8:28,

14

15         "Defendants have come forward with evidence on summary judgment
          that they maintain policies and training related to the actions undertaken at
16         the Jessen residence.  The FCSO [and CPD states that it has a policy,
          practice and custom of training deputies in the use of reasonable force,
17         searchand seizure, and the use of CS tear gas, as well as other chemical
          agents, as well as a policy, practice of exercising only the force that is
          reasonable and necessary to protect the safety of its deputies and others."

18

19      34.    Coupling this finding as well as considering all of the evidence, circumstantial as

20  well as direct, establishes factual circumstances that Plaintiffs understood supported the §1983

21  action because Clovis' actions were executed and implemented during the Jessen operation

22  pursuant to the authority under Clovis' and County's policies and training at the Jessen

23  residence.

24      35.    Plaintiffs' consideration of *Monell,* correctly or erroneously, was reasonable,

25  made in good faith, without any intent to harass and with an honest conclusion that *Monell*

26  liability could be established where, as here, the unconstitutional action was the product of

27

28

policies, customs, practices and training.  The Plaintiffs' prosecution of this action has never been frivolous.

36.    The fact is Plaintiffs' allegations, evidence, and argument were understood in good faith to reasonably support the imposition of municipal liability based upon the Supreme Court's analysis, language, and conclusions expressed in *Monell* and other legal authority which was relied upon by Plaintiffs in continuing the prosecution of the action against both Defendants after expert disclosure.

37.    Plaintiffs' consideration of *Monell* liability is addressed above but additional analysis and consideration of the *Monell* claim was continually analyzed with respect to the factual and legal issues applicable to the good faith, reasonable justification, and basis for the continuation of action thereafter. A multitude of cases were reviewed by Plaintiffs wherein courts initially announced the principle that  "[T]o establish personal liability in a §1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." (*Hafer v. Melo,* 502 U.S. 21, 25 (1991).  Plaintiffs determine such elements were easily established and would serve to establish liability of the Defendants in the execution and implementation of their policy, customs, and practices that existed and were testified to by each of Defendants' witnesses.

38.    Based on the facts and circumstances of the FCSO and CPO "joint" SWAT operation as testified to by participating officers, and the totality of known evidence,  Plaintiff reasonably and in good faith reached the opinion that the actions taken in the execution and implementation of Defendants' professed policies, customs, and practices constituted "state action."

39.    It was also reasonably concluded that multiple deprivations of Constitutional rights had resulted, stemmed from, and constituted the execution and implementation actions emanating from Defendants' policies, customs, and practices, which included the **presumed**

**Constitutional violations** in failing to obtain a search warrant before entering the Jessen residence, violation of the Fifth Amendment in taking complete control of the Jessen property and evicting the Jessen from the premises, and the violent, extensive, unnecessary use of force in violation of the Constitution, among other Constitutional violations.

40.    Having these principles in mind as a basis for filing and continuing the action, Plaintiffs' continued the § 1983 action against the Defendants and next considered and evaluated the legal and factual limits of §1983 liability imposed by *Monell* and its application to a 42 U.S.C. 1983 action.  To that end, the  language in *Monell* and other legal authority considered by Plaintiffs' justified their good faith belief, rightly or wrongly, the viability of the §1983 action and constituted valid grounds to continue the prosecution of the case after expert disclosure.  The Court states in *Monell, supra,*

> "We conclude, therefore, that a local government may not be sued under §1983 for an injury inflicted solely by its employees or agents. **Instead it is when __execution__ of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may be fairly said to represent official policy, inflicts the injury that the government as an entity is responsible under §1983." (Emp. Added.)** (*Monell, supra, at p. 695)*

41.    Thus, one of Plaintiffs' conclusions was that under *Monell,* municipal liability could be imposed not only for provisions of a policy, regulation, or ordinance that are unconstitutional on its face, but also result from unconstitutional action taken pursuant to the implementation and execution of a facially Constitutional policy and/or custom.  *Monell* was understood, or misunderstood, by Plaintiffs, in concluding a municipality can maintain an express policy that, **when enforced,** causes a Constitutional deprivation that satisfies a *Monell* liability claim.

42.    Plaintiffs were of the serious and reasonable belief that the focus of this *Monell* principle was on the **"action"** taken that is alleged to be unconstitutional which implements or executes a municipalities policy or custom or practice (*Monell, supra* p. 690-691).

43.    Here, there could be little doubt based on the SWAT policies, customs, and practices of the Defendants testimony of their officers, the documentation and declarations that there were numerous policies and customs applicable to CPD and FCSO SWAT operations pursuant to which the Jessen operation was implemented and executed.    Such undisputed evidence raised the question as to the constitutionality of Defendants implementation and execution of such actions pursuant to Defendants' policies, customs and practices and thus, Plaintiffs were of the sincere belief that *Monell* liability was satisfied.

44.    Plaintiff did not assert Clovis' policies to be unconstitutional on their face as the basis for *Monell* liability, rather Plaintiffs alleged, presented undisputed evidence, and argued on their understanding of *Monell,* that the **action taken** by Defendants in the implementation and execution of the their policies, customs and practices resulted in Constitutional deprivations to the Jessens.

45.    It was equally considered that by reason of the officers' testimony stating their actions were taken pursuant to Clovis' policies, customs, and practices and therefore its actions reflected its policies, customs, and practices.    It would follow that if Clovis' actions performed pursuant to Clovis and Fresno County policies, customs, and practices are determined to be unconstitutional, this finding would appear to result in the reasonable conclusion that the policies, customs, and practices of Clovis and the FCSO under which their action was implemented and executed in the Jessen operation were also unconstitutional. This analysis was but another consideration of *Monell* undertaken by Plaintiffs.

46.    Plaintiffs understood in good faith, rightly or wrongly, that this and other analyses justified the action against Clovis and its continuation after expert disclosure in that Plaintiffs understood *Monell* liability for Constitutional deprivations could be based on governmental "custom" and unconstitutional implementation and execution of such customs.

1    This conclusion was based on the language of *Monell* in pages 690-691, where the Court states

2    the following:

3        "[A]lthough a §1983 action against a government body is an allegation
         that official policy is responsible for deprivation of rights protected by the

4        Constitution, local governments, like every other §1983 'person,' **by the
         very terms of the statute, may be sued for constitutional deprivations**

5        **visited pursuant to governmental 'custom' even though such a custom**

6        **has not received formal approval through the body's official decision**
         **making channels." (Emp. Added).**

7

8    47.    Plaintiffs focused the Defendants' violation of §1983 in the Jessen operation on

9    the Constitutionality of the "execution" and "implementation" of their actions pursuant to their

10   policies, customs, and practices that each of the officers testified were implemented, executed,

11   and employed by the Defendants in the Jessen action.

12   48.    A difficult understanding of *Monell* liability also existed in language that

13   pertained to the relationship of the relevant policy, custom, or practice, and what role or

14   requirements such matters played in establishing or refuting *Monell* liability.  There is no doubt

15   that a policy unconstitutional on its face, if established, supports the imposition of Monell

16   liability.   Plaintiffs quandary was the attempt to understand what role or relationship was

17   required to support a §1983 claim where the policy was unconstitutional on its fact and the

18   execution and implementation of the policy was unconstitutional.

19

20   49.    The Court's order granting summary Judgment is supportive of and consistent

21   with Plaintiffs' understanding as to the necessary showing for CPD and FCSO to be held liable

22   under §1983. It is also consistent with the legal authority discussing the role of policy or custom

23   considerations in establishing §1983 liability.   In analyzing "Section 1983 Claims," the Court

24   citing *Monell* and other authority describes the role, relationship and requirements regarding

25   customs and policies in a §1983 action stating in p. 6:17-19 as follows:

26       "[T]he only named defendants remaining in this action are public entities,

27       which may be held liable under §1983 only if plaintiffs can show that their

28

constitutional injury was **caused by employees acting pursuant to the City or County's policy or custom." (Emp. Added)**

50.    This showing is the very showing Plaintiffs were seeking to present and did present, to wit, the "constitutional injury **was caused by employees acting pursuant to the City or County's policy or custom."** Although the Court rejected evidence supporting this contention, and decided as matters of law evidentiary facts clearly supporting Plaintiffs' argument, this is what Plaintiffs reasonably believed the undisputed evidence established in support of *Monell* liability and does not constitute or support Clovis' frivolous action theory.

51.    Plaintiffs acknowledge difficulty in addressing and arguing the causation issue, but are not alone in such difficulty. As stated in *City of Canton, Ohio v. Harris* (1989) 489 U.S. 378, 385–386,

> "Thus, our first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation. **The inquiry is a difficult one; one that has left this Court deeply divided in a series of cases that have followed *Monell*;** [4] one that is the principal focus of our decision again today.

> Based on the difficulty that this Court has had defining the contours of municipal liability in these circumstances, petitioner urges us to adopt the rule that a municipality can be found liable under § 1983 only where "the policy in question [is] itself unconstitutional." Brief for Petitioner 15. Whether such a rule is a valid construction of § 1983 is a question the Court has left unresolved." (Emphasis added).

52.    This question appears to be unresolved, at least in Plaintiffs'' pursuit of the answer.  However, in further considering *Court City of Canton, Ohio*, supra in p. 288-389, Plaintiffs' theories in applying *Monell* seems to focus, as did Plaintiffs' research and application of *Monell* limitations on the role of municipal policies and customs wherein the Court states,

> "This rule is most consistent with our admonition in *Monell*, 436 U.S., at 694, and *Polk County v. Dodson*, 454 U.S. 312, 326, that a municipality can be liable under § 1983 only where its **policies are the "moving force [behind] the constitutional violation."**

53.    Although the Court was critical of Plaintiffs' *Monell analysis* in its argument on summary judgment, its application over the years has been subject to substantial misunderstanding, lack of understanding, and what the various provisions of the ruling mean and how *Monell* is applied in various situations.   Commentators' analysis of *Monell* have prefaced their analyses indicating that "In the wake of the U.S. Supreme Court's decision in *Monell* . . . a complex and evolving body of law has developed concerning the liability of municipal governments under §1983." (Journal of the Kansas Bar Association, Dec. 1998, p. 2).

54.    It has been observed that beyond the two broad conceptual pronouncements, the Supreme Court consciously declined to flesh out in detail the various methods through which municipalities could be held liable under §1983.  (Id.).

55.    The Supreme Court recognizes the lack of clarity as to some issues of the *Monell* ruling regarding the issue of the causation link between the policy, custom or practice and the constitutional deprivation as stated in *City of Canton, Ohio v. Harris* (1989) 489 U.S. 378, 385–386, cited and discussed above. The Supreme Court observes that in "any case alleging municipal liability under § 1983," "the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation" arises.  The Court states, "The inquiry is a difficult one; one that has left this Court deeply divided in a series of cases that have followed *Monell*; [4]  Thus, while Plaintiffs' misunderstood, and possibly mistaken analysis of *Monell,* rightly or wrongly, does not constitute a frivolous claim entitling Clovis to attorney fees.

56.    In fact, the contents of the discovery requests and responses cited by Clovis occurred before the first witness regarding the factual circumstances of the SWAT operation at the Jessens residence of  Lt. Matt Alexander, FCSO, was taken occurring on April 16, 2018. Plaintiffs understood and concluded that such Deposition testimony taken thereafter established

1    and confirmed without dispute the allegations of Plaintiffs' complaints and relevant factual

2    circumstances regarding satisfaction of *Monell* liability.

3         57.    After addressing this discovery, the *Monell* ruling, the principles announced

4    therein which were understood to apply and validate Plaintiffs' §1983 action, and related cases

5    discussing or explaining its application, Plaintiffs determine the viability of their *Monell*

6    liability claim as having substantial merit. Clovis' discussion of the discovery activities do nor

7    refute this conclusion, nor established the continued action was frivolous.

8

9         58.    The Court order did not specifically address the validity of the Constitutional

10   violations of the Fourth, fifth and Fourteenth Amendments upon which Plaintiffs' §1983 action

11   was based in granting Clovis' summary judgment resting its analysis and judgment solely on the

12   principles established in *Monell* and related authority discussing *Monell* liability. The Court's

13   sole reliance and Judgment based solely on *Monell* is expressed in the following conclusion of

14   the Court:

15            "Plaintiffs have failed to establish a triable issue with respect to any of
              their theories of liability under *Monell*. Based on the undisputed facts
16            before the Court, the City and County are entitled to summary judgment in
              their favor with respect to plaintiffs' *Monell claim."* (Order, p. 16)

17

18        59.    As indicated above, the rejection of Plaintiffs' *Monell* summary judgment

19   opposition and justification for continuing to pursue the §1983 action, Plaintiffs believed under

20   the complete review and application of the evidence and the law, genuine and material disputed

21   genuine issues of fact existed and were presented by Plaintiffs as to the application and analysis

22   of *Monell* liability.

23        60.    If Plaintiffs' *Monell* argument was unclear, misstated or improper in some other

24   manner, as implied by the Court, the above described analysis and conclusions regarding

25   Plaintiffs' argument on *Monell* liability was undertaken by Plaintiffs in absolute good faith, in

26   the sincere belief it was correct, and in the belief that it provided substantial support for the

27

28

imposition of *Monell* liability after expert disclosure. This continuance prosecution was definitely not "frivolous" under the law.

61.    Of course, if the Court determines Plaintiffs prosecution of its §1983 action is not "Frivolous," Clovis is not entitled to an award of attorneys' fees. However, in the event the Court erroneously concludes it was frivolous, Clovis seeks the sum of $51,496 for legal work occurring after fact discovery close on May 1, 2018, or alternatively, after expert disclosure occurring on June 1, 2008. The summary judgment was filed by Clovis on September 18, 2018. Thus, the claim of $51,496 for the work by five (5) lawyers for less than three (3) months that consisted primarily of work on the summary judgment is unreasonable and excessive.

62.    First, the experience of this law firm and in particular Kevin Allen in handling municipal liability cases including §1983 liability cases is extensive. The Declaration of Kevin Allen establishes he has "specialized in 42 U.S.C. §1983 litigation since 2012" and has extensive and numerous cases that include addressing *Monell* liability. (Kevin Allen Decl. ¶6) By reason of such vast and all-inclusive representation of municipalities in §1983 cases, the law firm and specifically Mr. Allen must have a substantial case bank of authority and experience that concern *Monell* liability and §1983 liability that necessitated little or perhaps no further research or analysis.

63.    Indeed, Kevin Allen's experience, exposure and trials concerning §1983 certainly would have served to reduce the number of hours necessary to prepare Clovis motion for summary judgment and the high probability exists the firm, and Mr. Allen have a bank of §1983 briefs and related pleadings to reference and apply in preparing Clovis' motion.

64.    Mr. Allen states he has "been co-counsel or lead counsel in approximately 75 matters across the Northern and Eastern Districts of California. All But a handful were Section 1983 litigation" (Allen Decl. ¶7) and obtained partial or complete summary judgment in at least fifteen (15) Section 1983 cases. . ." (Allen Decl. ¶9)

65.    While Mr. Allen states he attended "all Clovis personnel depositions," Mr. Allen never left his office as to those depositions, listening by phone with few questions being asked. Whether he was listening or working on other matters is unknown.

66.    While Mr. Allen claims on June 4, 2018, he performed a meet and confer by phone with Plaintiffs' counsel, but the call did not include a "detailed" admonition by Mr. Allen as to the grounds for Clovis' intended motion for summary judgment. Other than mentioning *Monell*, little more was sufficiently addressed and his characterization of the conversation is disputed.

67.    Finally, while Clovis has provided a chart of the attorneys working on this matter in p. 16, no itemization is provided to Plaintiffs' knowledge of the activities describing the charges. Without a detailed description upon which the attorneys' fees claim is made, it cannot be determined whether the hour or total fees claim is justified by the activities it represents. Without an itemization of the activities making up the fees, the propriety of the fees, the activity giving rise to the fees, the reasonableness of the hours and activities performed cannot be performed to make an informed decision on such issues and determine whether such activities are specifically related and reasonable in amount and time. For these reasons as well, the Clovis' request for an award of attorneys' fees should be denied.


Dated: February 19, 2019                    Respectfully Submitted,

                                            Georgeson and Belardinelli
                                            A Professional Corporation

                                            By /s/ *Richard A. Belardinelli*
                                            Richard A. Belardinelli
                                            Attorneys for Plaintiffs, David Jessen and Gretchen
                                            Jessen.

# EXHIBIT 1

# EXHIBIT 1 TO DECLARATION OF RICHARD A. BELARDINELLI IN OPPOSITION TO DEFENDANT CITY OF CLOVIS' MOTION FOR ATTORNEYS FEES

**37.**    In walking just past the Jessen's mailbox, a FCS Officer named Lieutenant Matt Alexander gave Jessen his card and informed Jessen "We have insurance for this."

CRG Decl. ¶ 3, Ex. 1: Jessen Depo., p. 24:10-13


**42.**    The operation activities taken at the Jessen residence on June 11, 2016 were taken under the authority of the laws of the State of California and performed on behalf of the County of Fresno.

CRG Decl. ¶ 4, Ex. 2: Deposition of Lieutenant Matt Alexander taken April 19, 2018 ("Alexander Depo.") p. 23:3-16

**45.**    Over the last five or ten years, pursuant to policy, customs, or practice, FCSO has worked more closely with Clovis Police Department SWAT team and trained together pretty often.

CRG Decl. ¶ 4, Ex. 2: Alexander Depo. p. 35:25 to p. 36:6

**50.**    Chanley Un, the suspect inside the Jessen residence was a homeless person who was just looking for a place to find some food and to sleep, or something like that.

CRG Decl. ¶ 4, Ex. 2: Alexander Depo. p. 49:16-22

**56.**    With respect to the Jessen incident in issue, Lieutenant Matt Alexander ("Alexander") was the Fresno County Sheriff Officer "Special Weapons and Tactics ("SWAT") officer in charge of the Jessen operation.

CRG Decl. ¶ 4, Ex. 2: Alexander Depo. p. 12:15-23

**61.**    There were two (2) armored vehicles used at the Jessen incident which were "communal" resources between Clovis PD SWAT, Fresno PD SWAT and FCSO SWAT, the "Bearcat," and the MRAP.

CRG Decl. ¶ 4, Ex. 2: Alexander Depo. p. 57:4-17; p. 58:4-11; p. 58:12-19; p. 60:3-5

**69.**    At the time of Alexander's arrival to command the SWAT unit, he was told by Patrol units they had containment of the house meaning "if someone tried to escape they would be able to prevent that."

CRG Decl. ¶ 4, Ex. 2: Alexander Depo. p. 73:9-16

**70.**    Alexander characterizes the Jessen incident as a "residential burglary" acknowledging a helicopter is not deployed in every residential burglary.

CRG Decl. ¶ 4, Ex. 2: Alexander Depo. p. 74: 13-20; p. 75:16-18

**71.**    There were members of the Clovis Police Department SWAT Team on scene at the Jessen that participated in the operation.

CRG Decl. ¶ 4, Ex. 2: Alexander Depo. p. 79:6-16

**72.**    Lt. Alexander testified in a residential burglary such as this, the FCSO SWAT team is not called out every time.

CRG Decl. ¶ 4, Ex. 2: Alexander Depo. p. 79:25-80:3

**73.**    FCSO requested Clovis Police Department also requested a couple of snipers to assist at the Jessen residence even though FCSO had a sniper unit stating the FCSO SWAT sniper team trains with Clovis Police regularly.

CRG Decl. ¶ 4, Ex. 2: Alexander Depo. p. 82:10-15; p. 82:19-22; p. 82:23 – 83:8

**74.**    Alexander confirms it is the policy, custom or practice for FCSO and Clovis P.D. to train a few years ago (2016) every month.

CRG Decl. ¶ 4, Ex. 2: Alexander Depo. p. 84:19-85:13

**75.**    In the Jessen operation there were no search warrants obtained before entry into the residence, but Alexander says they were probably working on one, but not sure.

CRG Decl. ¶ 4, Ex. 2: Alexander Depo. p. 86:5-7; p. 86:8-12

**76.**    The policy, custom and practice for the SWAT team is to obtain a search warrant on other SWAT operations, and search warrants have been obtained by the FCSO SWAT team on other operations.

CRG Decl. ¶ 4, Ex. 2: Alexander Depo. p. 86:13-22

**77.**    The SWAT team has a policy, custom and practice to typically assign a detective to start writing a search warrant, but if there are exigencies, they will continue

to work towards apprehension under the exigency exception but they do seek a search warrant.

CRG Decl. ¶ 4, Ex. 2: Alexander Depo. p. 86:16-22

**78.**    The Jessen operation began at 2:06 p.m. and the suspect ended up in custody a few minutes after 7:00 p.m.

CRG Decl. ¶ 4, Ex. 2: Alexander Depo. p. 87:2-7

**80.**    The SWAT team has a policy, custom or practice for "not opting not to get a search warrant" at the Jessen residence and "just weren't waiting for one to attempt apprehension."

CRG Decl. ¶ 4, Ex. 2: Alexander Depo. p. 87:17-21

**81.**    Anytime you have a suspect inside a structure who is refusing to come out and submit to lawful arrest, the FCSO calls it a "barricaded subject," that is not necessarily a physical barrier.

CRG Decl. ¶ 4, Ex. 2: Alexander Depo. p. 84:5-11

**82.**    Lt. Alexander never saw a partial or fully completed application for search warrant in the Jessen case and doesn't remember if one was requested.

CRG Decl. ¶ 4, Ex. 2: Alexander Depo. p. 90:10-17

**83.**    It is the policy, custom or practice for the FCSO that's earch warrants are normally sought in a case where the FCSO is going to force entry into a structure.

CRG Decl. ¶ 4, Ex. 2: Alexander Depo. p. 90:21-23

**84.**    When the FCSO obtains a search warrant they make an announcement to the suspect that they have a search warrant and if the suspect doesn't comply with their instructions they enter the residence, but this never occurred at the Jessen residence because there was no search warrant.

CRG Decl. ¶ 4, Ex. 2: Alexander Depo. p. 91:21 – p. 92:4

**85.**    Shooting tear gas projectiles into a building is considered an "entry" by the FCSO.

CRG Decl. ¶ 4, Ex. 2: Alexander Depo. p. 92:5-8

**88**.    It is the policy, custom or practice for the FCSO SWAT team leaders who were at the site to make the decision, and did so, in the Jessen incident to deploy the tear gas, namely Sergeant Essegian, and Sergeant Woodrum.

CRG Decl. ¶ 4, Ex. 2: Alexander Depo. p. 103:9-20

**95**.    Lt. Alexander is not aware of anyone from the FCSO or CPD asking the Jessens for permission to inject or throw or otherwise deploy tear gas into the residence.

CRG Decl. ¶ 4, Ex. 2: Alexander Depo. p. 112:20-23

**96**.    Lt. Alexander is not aware of anyone from the FCSO or CPD asking the Jessens for permission to take any other action, tear down their fence, or anything else.

CRG Decl. ¶ 4, Ex. 2: Alexander Depo. p. 112:24 – 113:1

**\*\*100**. After the incident, Lt. Alexander gave David Jessen his card and referred him to Fresno County Risk Management where he would be able to submit a claim for the property damage involved.

CRG Decl. ¶ 4, Ex. 2: Alexander Depo. p. 116:15 – p. 117:4

**108**.    After the incident, Lt. Alexander and Sergeant Woodrum, team leader at the scene, walked around the residence and Lt. Alexander asked him questions about his actions taken during the operation including (1) why did that have to be broken as to the damage sustained to the residence or exterior  (2) made Woodrum explain why anything got damaged or had to be damaged to make sure "we're justified in doing anything we do out there "

CRG Decl. ¶ 4, Ex. 2: Alexander Depo. p. 125:14 – p. 126:12

**109**.    In asking Sergeant Woodrum questions about his actions, Lt. Alexander states he wanted him "to explain everything they break to me," and so he had Woodrum "explain" and provide justification" because "we take respect for people's property very seriously" and that he wanted "to make sure we're justified in doing anything we do out there.

CRG Decl. ¶ 4, Ex. 2: Alexander Depo. p. 126:1-12

**110**.    What actions he took in apprehending the suspect to see if such actions were justified and to maintain standards of the SWAT team and he does not recall how many things he mentioned, why something happened, and made no record of what he asked Woodrum and what Woodrum answered and no report of his conversation was written by Woodrum.

CRG Decl. ¶ 4, Ex. 2: Alexander Depo. p. 126:13- p. 127:1

111.    Lt. Alexander's bosses, including the Assistant Sheriff, had questions about the actions taken in the Jessen operation including "why we employed tear gas, why we had to break doors.

CRG Decl. ¶ 4, Ex. 2: Alexander Depo. p. 127:13-24

130.    The law enforcement presence at the Jessen resident to apprehend a homeless transit who had been peaceably evidenced by construction workers included the following:

*50 sheriff's vehicles parked along Rolinda Avenue. (CRG Decl. ¶ 3, Ex. 1: Jessen Depo, p. 23:9-18)

*A SWAT vehicle and FCS officers all over, up and down Rolinda Avenue. (CRG Decl. ¶ 3, Ex. 1: Jessen Depo, p. 23:9-18)

* Two City of Fresno Police officers and a canine were at the scene. (CRG Decl. ¶ 4, Ex. 2: Alexander depo p. 38:14-17; CRG Decl. ¶ 8, Ex. 6: Pulkownik Depo. p. 73:14 – p. 74:3)

*A FCSO robot with camera. (CRG Decl. ¶ 4, Ex. 2: Alexander depo p. 45:25 – p. 46:2)

*Two armored vehicles, the FCSO Bearcat, and the CPD MRAP. (CRG Decl. ¶ 4, Ex. 2: Alexander depo p. 57:4-17;p. 58:4-11; p. 58:12-19; p. 60:3-5)

*Air support of a Helicopter. (CRG Decl. ¶ 4, Ex. 2: Alexander depo p. 72:18-24)

*4 CPD Swat team members. (CRG Decl. ¶ 6, Ex. 4: Boldt depo p. 14:7-11)

*2 CPD snipers and additional FCSD sniper teams were present. (CRG Decl. ¶ 4, Ex. 2: Alexander depo p. 82:10-15; p. 82:19-22; p. 82:23 – p. 83:8; CRG Decl. ¶ 7, Ex. 5: Woodrum Depo p. 64:8-20)

*2 ambulances (CRG Decl. ¶ 4, Ex. 2: Alexander depo p. 122:22 – p. 123:23)

* A fire truck (CRG Decl. ¶ 4, Ex. 2: Alexander depo p. 122:22 – p. 123:23)

*multiple California Highway Patrol Units blocking intersections and shutting Rolinda down. (CRG Decl. ¶ 4, Ex. 2: Alexander depo p. 122:22 – p. 123:23)

*In excess of 50 FCSO officers were at the scene of the Jessen incident including 17 SWAT team members. (CRG Decl. ¶ 4, Ex. 2:
Alexander depo p. 146:18 – p. 147:5; CRG Decl. ¶ 7, Ex. 5: Woodrum Depo p. 7:3 – p. 9:20; p. 55:18 – p. 56:9, and Ex. 2 thereto; CRG Decl. ¶ 8, Ex. 6: Pulkownik Depo. p. 161:10 – 165:11 and Ex. 2 thereto)

*A Crisis Negotiation team of several FCSO officers. (CRG Decl. ¶ 7, Ex. 5: Woodrum Depo p. 73:20 – p. 74:6)

    **150.**    After the exterior walk-around, a law enforcement officer from the FCSO named Matt Alexander gave the Jessens his card and Alexander and another officer said to them they had insurance for this.

CRG Decl. ¶ 5, Ex. 3: GJ Depo. p. 26:20-24; p. 27:8-13

    **155.**    The MRAP is owed by the City of Clovis which has an agreement where it can be used by other law enforcement agencies including the FCSO and the Fresno Police Department.

CRG Decl. ¶ 6, Ex. 4: Boldt Depo. p. 11:22-p. 12:9

    **157.**    Two CPD (2) snipers were deployed to the Jessen residence.

CRG Decl. ¶ 6, Ex. 4: Boldt Depo. p. 14:7-11

    **158.**    Lieutenant Alexander from the FCSO was in charge of the Jessen operation as it was their SWAT operation and FCSO determined the use of the MRAP as well as the CPD team leader Corporal Shurtliff who reported to Lt. Alexander.

    **160.**    The function of the CPD officers was to serve whatever Lieutenant Alexander required in the Jessen operation as CPD SWAT members.

CRG Decl. ¶ 6, Ex. 4: Boldt Depo. p. 19:8-12

    **171.**    At the time of the CPD MRAP armored vehicle arrival, FCSO were present at the Jessen residence surrounding the residence.

CRG Decl. ¶ 6, Ex. 4: Boldt Depo. p. 32:2-7

    **172.**    At the time of the CPD MRAP and CPD officers including officer Boldt, tear gas had already been deployed.

CRG Decl. ¶ 6, Ex. 4: Boldt Depo. p. 32:24 – p. 33:2; p. 37:12-13

    **175.**    Officer Boldt is not aware of any offensive action being taken by the suspect Un in terms of attempts to harm police officer on the scene such as shooting or anything else.

CRG Decl. ¶ 6, Ex. 4: Boldt Depo. p. 34:20-23

    **177.**    At the time of CPD's and the MRAP's arrival, the Jessen residence was completely surrounded by the FCSO SWAT team.

CRG Decl. ¶ 6, Ex. 4: Boldt Depo. p. 35:12- 17

179.    There is a joint agreement between the FCSD, CPD, and Fresno Police Department to engage in joint operations at the request of one of the agencies which CPD has done multiple times.

CRG Decl. ¶ 6, Ex. 4: Boldt Depo. p. 38:7-18

180.    Exhibit 1 to the Boldt Deposition (also Exhibit A attached to CPD Declaration of Kevin Allen) is identified as the "After Action Report" titled "City of Clovis Memorandum"
Pertaining to the Jessen operation.  (the "CPD Memorandum")

CRG Decl. ¶ 6, Ex. 4: Boldt Depo. p. 38:23-p. 39:1; Exhibit A attached to CPD Declaration of Kevin Allen in support of CPD Motion

181.    The purpose of the CPD Memorandum is required by City of Clovis policy, and the Memorandum acts as a record memorializing what exactly took place and is the only CPD report of the Jessen incident.

CRG Decl. ¶ 6, Ex. 4: Boldt Depo. p. 38:23-p. 39:9; Exhibit A attached to CPD Declaration of Kevin Allen in support of CPD motion.

182.    CPD officer Boldt read the Memorandum the day of his deposition and the Memorandum accurately memorializes the Jessen incident.

CRG Decl. ¶ 6, Ex. 4: Boldt Depo. p. 39:10-p. 39:14; Exhibit A attached to CPD Declaration of Kevin Allen in support of CPD Motion

185.    The CPD officers at the Jessen scene did not apply for a search warrant at any time.

CRG Decl. ¶ 6, Ex. 4: Boldt Depo. p. 42:1- 3

186.    It was policy, custom or  practice for the CPD and FCSO SWAT teams to train together at a point in time "every month with them" including training exercises between the SWAT team and the MRAP in preparing for an event like the Jessen operation that included use of the MRAP and the FCSO BearCat.

CRG Decl. ¶ 6, Ex. 4: Boldt Depo. p. 45:2 – 24

189.    It was a policy, custom or practice the CPD which does not have specific locations to perform training undertaking training all over the City of Clovis and Fresno County.

CRG Decl. ¶ 6, Ex. 4: Boldt Depo. p. 51:20-24

192.    A total of in excess of 50 FCSO officers, including 17 SWAT deputies from the FCSO who were involved and present in the operation at the Jessen's residence on June 11, 2016 to apprehend the suspect who trespassed to the Jessen's residence.

CRG Decl. ¶ 7, Ex. 5: Woodrum Depo. p. 7:3 – 9:20, p. 31:22-24; p. 55:18 – 56:9; and Exhibit 2 thereto, p. 1-2; CRG Decl. ¶ 8, Ex. 6: Pulkownik Depo. p. 161:10 – p. 165:11 and Exhibit 2 thereto, p. 1-2; Joint Statement of Undisputed Material Facts, Undisputed Fact No. 1.

193.    There were four (4) sergeants in addition to Lt. Alexander at the Jessen operation and the operation was run in accordance with policy and procedure number 432.

CRG Decl. ¶ 7, Ex. 5: Woodrum Depo. p. 17:18 – 18:2; p. 18:12-18

195.    The FCSO does not have a policy or procedure, directive, or Standard Operating Procedure (SOP) relating to the deployment of tear gas, storage, and that type of thing in its use of CS tear gas.

CRG Decl. ¶ 7, Ex. 5: Woodrum Depo. p. 29:6-12

196.    The suspect in the Jessen residence never fired shots or anything like that at the officers present at the incident.

CRG Decl. ¶ 7, Ex. 5: Woodrum Depo. p. 36:16-20

197.    There was no offensive action taken by the suspect in the Jessen residence that allegedly created an immediate danger to the lives of the deputies except the threat of shooting them.

CRG Decl. ¶ 7, Ex. 5: Woodrum Depo. p. 36:21-24

199.    The FCSO BearCat armored vehicle at the scene was used as cover for a deputy to deploy a tear-gas canister which was hand delivered by a deputy into the interior of the Jessen residence; deployed gas directly into the residence through its tube (ram).

CRG Decl. ¶ 7, Ex. 5: Woodrum Depo. p. 39:14-18; 39:19-24; p. 39:19 – p. 40:14

200.    The BearCat also admittedly deployed at least ten (10) 40 millimeter tear gas projectiles into the Jessen residence through the windows

CRG Decl. ¶ 7, Ex. 5: Woodrum Depo. p. 40:15 – 41:5; p. 42:11 – p. 43:5

202.    Three pyrotechnic types of tear-gas canisters were deployed at the Jessen residence totally at least 13 some of which were close enough to be deployed by SWAT team members who were close enough to the structure to hand deliver the canisters.

CRG Decl. ¶ 7, Ex. 5: Woodrum Depo. p. 45:21 – 46:5

205.    Woodrum explained to Jessen the tear gas was going to be in his house for a while, and that it was going to take a while for it to disperse which was the extent of his conversation with Jessen because Lt. Alexander was there and he would have given the number to Risk Management to Jessen.

CRG Decl. ¶ 7, Ex. 5: Woodrum Depo. p. 49:25 – p. 50:10

206.    The MRAP was used to break down a door, the BearCat pushed the gas ram through a back door.

CRG Decl. ¶ 7, Ex. 5: Woodrum Depo. p. 52:1-10

209.    Lt. Woodrum is not aware of anyone seeking a search warrant for this operation but has seen search warrants obtained before the SWAT unit undertook to enter a structure in situations that are not pre-planned events.

CRG Decl. ¶ 7, Ex. 5: Woodrum Depo. p. 60:4 – p. 61:1; p. 63:13-15

210.    It is the policy, custom or practice of FCSO if a situation exists where there is time permitted, a search warrant can be obtained before the officers perform some entry into a structure.

CRG Decl. ¶ 7, Ex. 5: Woodrum Depo. p. 61:2-5

211.    Four CPD and FCSD sniper teams were present at the Jessen resident involved in the operation deployed on the perimeter.

CRG Decl. ¶ 7, Ex. 5: Woodrum Depo. p. 64:3-20

212.    There were also canine units present at the Jessen resident involved in the operation who are part of the SWAT unit but were not deployed into the residence.

CRG Decl. ¶ 7, Ex. 5: Woodrum Depo. p. 65:14-19, p. 66:12-15

213.    One of the reasons the canines were not deployed into the Jessen residence was while dogs go in before humans "for sure", SWAT was not there yet and no one was going in there yet and because they did not want to send in the dogs at that time.

CRG Decl. ¶ 7, Ex. 5: Woodrum Depo. p. 67:3-13

217.    The FCSO has had training exercises with CPD.

CRG Decl. ¶ 7, Ex. 5: Woodrum Depo. p. 73:9-11

218.    In the Jessen operation there were a substantial number of officers called to the scene, a helicopter, a robot, the Crisis Negotiation Unit, a fire truck, two ambulances, the MRAP, and the BearCat.

CRG Decl. ¶ 7, Ex. 5: Woodrum Depo. p. 73:20 – p. 74:6

220.    The helicopter deployed to the Jessen operation was deployed for "situational awareness, containment" if "we get somebody running."

CRG Decl. ¶ 7, Ex. 5: Woodrum Depo. p. 79:11-16

221.    Under the policies, customs or practices the reason for obtaining a search warrant provides the FCSD officers "Legal authority to enter a house. Fourth Amendment."

CRG Decl. ¶ 7, Ex. 5: Woodrum Depo. p. 82:15-21

222.    The MRAP is an armored vehicle that is owned and maintained by the CPD, and there is a joint agreement between the Fresno Police Department, CPD and the FCSO for the use of the BearCat jointly.

CRG Decl. ¶ 7, Ex. 5: Woodrum Depo. p. 83:10 – p. 84:1

225.    The CPD "City of Clovis Memorandum" dated June 11, 2016 ("CPD Memorandum"), documents every incident that CPD SWAT Team either responds to or assists with, by an "After Action Report" prepared by Corporal C. Shurtliff per CPD policy that documents, memorializes the incident CPD was involved with and outlines anything that we did during that incident."

CRG Decl. ¶ 9, Ex. 7: Deposition of CPD Lt. Jorge Gomez, dated April 30, 2018 ("Gomez Depo"), p. 7:12-19; p. 7:20 – p. 8:2

226.    Lt. Jorge Gomez, a CPD Lieutenant, was at the Jessen operation scene one (1) hour before it resolved as a tactical commander was the recipient of the CPD Memorandum and reviewed the CPD Memorandum when received in June of 2016.

CRG Decl. ¶ 9, Ex. 7: Gomez Depo, p. 7:12-19, p. 9:5-8

227.    The CPD Memorandum is given to Lt. Gomez and also to all of the team leaders at the time who review the CPD Memorandum for errors, and if any errors are found, "they correct it" otherwise it is assumed to be accurate.

CRG Decl. ¶ 9, Ex. 7: Gomez Depo, p.8:3-11

**228.** Lt. Gomez confirms the June 11, 2016 SWAT After Action Report (CPD Memorandum) is accurate.

CRG Decl. ¶ 9, Ex. 7: Gomez Depo, p.8:12-14

**229.** The CPD SWAT team deployed four (4) members and two (2) snipers to the Jessen operation to assist the FCSO with the incident under the command of FCSO Lt. Alexander.

CRG Decl. ¶ 9, Ex. 7: Gomez Depo, p.:12:2-7; p. 13:2-9; p. 14:4-10

**230.** It is the policy, custom or practice for the CPD SWAT team and FCSO SWAT team and other areas of the department to train and work together on joint operations under guidelines, policy, procedure and practice.

CRG Decl. ¶ 9, Ex. 7: Gomez Depo, p.16:10-13; p. 17:21 – 18:11

**232.** The CPD MRAP has a ram attachment to it so it can be used for breaching purposes.

CRG Decl. ¶ 11, Ex. 9: Deposition of CPO David Roseno dated May 1, 2008 ("Roseno Depo") p. 19:1-9

**233.** The CPD SWAT team operating the MRAP at the Jessen operation was under the direction of the Fresno County Sheriff's Department, Lieutenant Alexander, and also under the direction of CPD team leader Corporal Shurtliff.

CRG Decl. ¶ 11, Ex. 9: Roseno Depo, p. 26:17-24

**236.** Officer Roseno does not recall of a situation in the past where "there's time to get a warrant" that "a warrant was obtained before" the SWAT team would exercise a SWAT option "to enter the structure."

CRG Decl. ¶ 11, Ex. 9: Roseno Depo, p. 41:13-17

**237.** It is a policy, custom or practice for CPD and the FCSO to do all kinds of things in joint SWAT training exercise, including barricaded suspects and all kinds of SWAT tactics.

CRG Decl. ¶ 11, Ex. 9: Roseno Depo, p. 44:9-17; p. 45:2-4; p. 46:10 – 13

**238.** CPD Corporal Curtis Shurtliff ("Shurtliff") was a member of the CPD SWAT team at the time of the Jessen incident in June of 2016.

CRG Decl. ¶ 12, Ex. 10: Deposition of CPO Corporal Curtis Shurtliff dated May 1, 2008 ("Shurtliff Depo") p.11:6 – 9

239.    It has been and is a policy, custom or practice that as a SWAT member for the CPD, Shurtliff has engaged in training sessions including training sessions with Fresno County Sheriffs.

CRG Decl. ¶ 12, Ex. 10: Shurtliff Depo, p. 13:11-22

240.    As assistant team leader, Shurtliff communicated with and took his commands from the team leader that was FCSO Woodrum as to what the MRAP was supposed to do.

CRG Decl. ¶ 12, Ex. 10: Shurtliff Depo, p. 14:25-15:13; p. 15:14-24; p. 16:4-8

242.    The MRAP removed a chain-linked fence at the Jessen premises to get the robot in a position to enter the residence through the sliding door.

CRG Decl. ¶ 12, Ex. 10: Shurtliff Depo, p. 20:23 – p. 21:15

244.    The "City of Clovis MEMORANDUM" is the SWAT "After Action Report" ("Memorandum") attached as Exhibit 2 to the Shurtliff Deposition that was prepared by Shurtliff.

CRG Decl. ¶ 12, Ex. 10: Shurtliff Depo, p. p. 25:16-18; 49:2–9; p. 50:23 – p.51:6; and Ex. 2 thereto

247.    Shurtliff understood that Lt. Alexander of the FCSO was in charge of the overall Jessen operation.

CRG Decl. ¶ 12, Ex. 10: Shurtliff Depo, p. p.30:7-14

248.    Shurtliff was instructed by Lt. Alexander of the FCSO to make contact with the team to operate the MRAP and was aware the Jessen residence was surrounded by law enforcement upon his arrival at the Jessen residence.

CRG Decl. ¶ 12, Ex. 10: Shurtliff Depo, p. 31:2-23

250.    The Memorandum is a report that Shurtliff prepared relating to the June 11, 2016 incident at the Jessen residence.

CRG Decl. ¶ 12, Ex. 10: Shurtliff Depo, p. 50:23 – p. 51:6; p. 52:14-17 and Exhibit 2 thereto

251.    The Memorandum is standard procedure for CPD SWAT especially if any damage is done, and is a custom and practice of the CPD.

CRG Decl. ¶ 12, Ex. 10: Shurtliff Depo, p. 51:13-22 and Exhibit 2 thereto

252.     The Memorandum is a report on the actions that took place by CPD team and what the CPD team did for later review.

CRG Decl. ¶ 12, Ex. 10: Shurtliff Depo, p. 51:23 – p. 52:2 and Exhibit 2 thereto

253.     The report is presented to Lt Gomez, CPD SWAT commander and Sergeant C. Aranas, Surtliff's superiors at the time.

CRG Decl. ¶ 12, Ex. 10: Shurtliff Depo, p. 52:10-17 and Exhibit 2 thereto

254.     Page 000004 of the Memorandum is a dialogue prepared by Shurtliff titled "Field Tactics Debrief Memo" which describes what occurred at the Jessen scene that occurred with respect to the CPD unit and the MRAP.

CRG Decl. ¶ 12, Ex. 10: Shurtliff Depo, p. 55:13 –24 and Exhibit 2 thereto

255.     With respect to the purpose for CPD being at the Jessen scene and what they did, the Memorandum accurately reflects what occurred.

CRG Decl. ¶ 12, Ex. 10: Shurtliff Depo, p. 56:10-13 and Ex. 2 thereto

257.     The entire "SWAT After Accident Report" in the Memorandum **accurately** sets forth what occurred in the Jessen operation upon CPD SWAT arrival at the scene.

CRG Decl. ¶ 12, Ex. 10: Shurtliff Depo, p. 56:3-13 and Exhibit 2 thereto

258.     Consistent with the policies, customs or practices with respect to the **purpose** for CPD SWAT being at the Jessen scene, and what CPD did, the "SWAT After Accident Report" in the Memorandum accurately **reflects what occurred, namely "Reason out of town training".**

CRG Decl. ¶ 12, Ex. 10: Shurtliff Depo, p. 56:10-13, and Exhibit 2 thereto

259.     Consistent with the policies, customs or practices the "SWAT After Action Report" states the "TYPE OF ACTION" as "MRAP to assist FSO SWAT Search Warrant."

CRG Decl. ¶ 12, Ex. 10: Shurtliff Depo, p. 52:18-23 and Ex. 2 thereto, bate stamped "Clovis (Jessen) 000001"

260.     Shurtliff is not aware of there being a search warrant issued describing it as a "generic term."

CRG Decl. ¶ 12, Ex. 10: Shurtliff Depo, p. 52:21 – p. 53:4, and Ex. 2 thereto

**261.**    Consistent with the policies, customs or practices the "SWAT After Action Report" included in the Memorandum in a section titled "Field Tactics Debrief Memo," bate stamped "Clovis (Jessen) 000003" states in a section titled "REASON" "Out of town training."

CRG Decl. ¶ 12, Ex. 10: Shurtliff Depo, pg. 25:16-18, p. 49:2-9, p. 50:23-51:6 and Exhibit 2 attached thereto, bate stamped "Clovis (Jessen) 000003"

**262.**    Consistent with the policies, customs or practices the "SWAT After Action Report" in the Memorandum in a section titled "Field Tactics Debrief Memo," bate stamped "Clovis (Jessen) 000003" states in a section titled "TRAINING ONLY:" the response is "no"

CRG Decl. ¶ 12, Ex. 10: Shurtliff Depo, pg. 25:16-18, p. 49:2-9, p. 50:23-51:6 and Exhibit 2 attached thereto, bate stamped "Clovis (Jessen) 000003"

**264.**    There is basically 21 SWAT members of the FCSO with a Lieutenant as a commander.

CRG Decl. ¶ 8, Ex. 6: Pulkownik Depo, p. 17:2-11

**267.**    The "Incident Report" was reviewed by FCSO Deputy Pulkownik and lists the officers from the FCSO present during the incident, including the Crisis Negotiation Team ("CNT").

CRG Decl. ¶ 8, Ex. 6: Pulkownik Depo, p. 32:13 – p. 33:6

**268.**    Throughout the day of the incident, the FCSO SWAT team had three (3) canine units, one from the Fresno Police Department at the Jessen residence scene.

CRG Decl. ¶ 8, Ex. 6: Pulkownik Depo, p. 33:10-24

**269.**    The purpose of deploying a dog into a residence to find or apprehend the suspect is "apprehension" because the canine can go in and take control of the suspect until he is handcuffed if they are able to locate the suspect.

CRG Decl. ¶ 8, Ex. 6: Pulkownik Depo, p. 36:13-22

**270.**    The canine can also be used to locate the suspect in the structure.

CRG Decl. ¶ 8, Ex. 6: Pulkownik Depo, p. 36:23 – p. 37:1

**281.** A perimeter of FCSO was set around the residence after the first attempt to enter the residence when the suspect made verbal contact with the deputies.

CRG Decl. ¶ 8, Ex. 6: Pulkownik Depo, p. 62:25 – p. 63:5

**282.** The helicopter on scene during the operation performed overhead observation of the perimeter.

CRG Decl. ¶ 8, Ex. 6: Pulkownik Depo, p.64:5-9

**285.** Two City of Fresno Police Officers were at the Jessen operation as a canine unit to assist in the FCSO operation.

CRG Decl. ¶ 8, Ex. 6: Pulkownik Depo, p. 73:14 – p. 74:3

**287.** A search warrant was never obtained to enter the Jessen property and no statements made that a search warrant was in process the FCSO was trying to obtain.

CRG Decl. ¶ 8, Ex. 6: Pulkownik Depo, p. 80:1-6

**288.** FCSO SWAT officer Pulkownik does not know why no warrant was obtained before the property was entered although SWAT would in prior situations obtain a Search Warrant.

CRG Decl. ¶ 8, Ex. 6: Pulkownik Depo, p.80:7-14

**289.** Contrary to policy, custom or practice FCSO SWAT officer Pulkownik is not aware of any operation involving a barricaded suspect in a residence that a search warrant was obtained.

CRG Decl. ¶ 8, Ex. 6: Pulkownik Depo, p. 82:13-23

**290.** There is no set time or established operating procedure as to how long negotiations will continue to allow the suspect the opportunity to surrender without further action, it just a "reasonable amount of time."

CRG Decl. ¶ 8, Ex. 6: Pulkownik Depo, p. 96:5-15

**294.** At the time of his arrest, the suspect did not demonstrate any erratic behavior to the arresting officer which would demonstrate he had an emotional or mental problem.

CRG Decl. ¶ 8, Ex. 6: Pulkownik Depo, p. 114:2-6

**297.** All of the actions of the deputies at the Jessen operation were acts in their capacity as Fresno County Sheriff officers.

CRG Decl. ¶ 8, Ex. 6: Pulkownik Depo, p. 122:14:18

302.    During the operation, the suspect never attempted to leave the residence and run for it as the house was encircled to prevent escape.

CRG Decl. ¶ 8, Ex. 6: Pulkownik Depo, p. 149:24-p.150:11

303.    In addition to the CPD sniper unit of two officers, the FCSO had snipers present at the Jessen residence operation as the FCSO and CPD have joint operations quite often.

CRG Decl. ¶ 8, Ex. 6: Pulkownik Depo, p. 150:17-25

304.    Tear Gas was deployed 15 – 20 minutes from the time Pulkownik arrived at the scene at 4:28 p.m. and was "continually deployed" after the suspect answered the telephone.

CRG Decl. ¶ 8, Ex. 6: Pulkownik Depo, p. 153:2-12; p.145:11-15; CRG Decl. ¶ 4, Ex. 2: Alexander Depo, p. 140:13 – 141:23 and Exhibit 4 attached thereto

312.    Defendants County of Fresno and City of Clovis designated Ronald K. Miller ("Miller") as their police practices expert.

CRG Decl. ¶ 13, Ex. 11

320.    It is Miller's opinion that under the circumstances at the time of Jessen's arrival that there are four police officers and their vehicles at the residence that believed a burglary was in progress, the would not and could not shut down the operation and leave even if Jessen told them he would handle the intruder.

CRG Decl. ¶ 13, Ex. 11: Miller Depo. p. 47:14-22

321.    It is Miller's opinion that at the point in time that Jessen arrived at the residence, **the police officers at the residence were in charge of the situation and Jessen was not.**

CRG Decl. ¶ 13, Ex. 11: Miller Depo. p. 47:23 – p. 48:3

325.    Miller opined if the police officers at his residence stated "give me the keys" Jessen would be expected to comply.

CRG Decl. ¶ 13, Ex. 11: Miller Depo. p. 50:13-16

326.    Miller opined and agreed that if Jessen is told by the officers at the Jessen residence to the incident to get off the property, Jessen would be required to comply.

CRG Decl. ¶ 13, Ex. 11: Miller Depo. p. 50:10-12

**331.**    Miller knows of no neighbors who were in danger as a result of the Jessen circumstances and does not know if there were any neighbors or any private citizens lives in danger when the events at the Jessen residence were occurring.

CRG Decl. ¶ 13, Ex. 11: Miller Depo. p. 58:1-4; p. 58:11-15

**332.**    The FCSO blocked off all of Rolinda Avenue From Jensen to North Avenue.

CRG Decl. ¶ 13, Ex. 11: Miller Depo. p. 60:13-18

**333.**    Lt Alexander, FCSO SWAT commander at the Jessen residence identified the exigent circumstances to Miller consisting of (1) the forced entry into the Jessen residence; 2) the suspect, Mr. Un's refusal to comply with lawful orders of police officers asking him to step out, (3) prevent the officers from making a consensual entry into the location by relocking the door as they tried to use the Key to enter; and made the threat that he would kill officers, and later on indicates he is armed.

CRG Decl. ¶ 13, Ex. 11: Miller Depo. p. 61:18 – p. 62:16

**334.**    Miller references in his report to a systemic plan and acquired information regarding that plan from FCSO Woodrum who was in charge of the chemical agent plan

CRG Decl. ¶ 13, Ex. 11: Miller Depo. p. 68: 6-16

**335.**    Miller has previously seen written chemical agent plans which consist of a "preplanned operation" but has not seen one in this case and does not believe there is one.

CRG Decl. ¶ 13, Ex. 11: Miller Depo. p. 68:17- p. 69:3

**336.**    Miller's understanding of the policy and procedures of the FCSO SWAT team is that Lieutenant Alexander and Sergeant Woodrum had authority to approve the systematic plan for chemical agent deployment.

CRG Decl. ¶ 13, Ex. 11: Miller Depo. p. 69:4-11

**346.**    Exhibit 7 to the Defoe deposition is a "County of Fresno produced document No. 001995 with a section titled "Individual Peace Officer Responsibilities" with respect to Chemical Agent Use from the California Tactical Association, FCSO SWAT training, with Defoe highlights of item 4, 5, and 6.

CRG Decl. ¶15, Ex. 13: Defoe Deposition, p. 16:7 – p. 17:20 and Ex. 7 thereto

347.    The policy, custom or practice of the FCSO is set forth in Paragraph Number 2 of the Fresno County document, Exhibit 7, states "Use only that force which is reasonable."

CRG Decl. ¶15, Ex. 13: Defoe Deposition, p.16:7-10 and Ex. 7 thereto, ¶2

348.    The policy, custom or practice of the FCSO is set forth in Paragraph Number 4 of the Fresno County document, Exhibit 7, states "Respect both private and public property at all times when deploying chemical agents."

CRG Decl. ¶15, Ex. 13: Defoe Deposition, p.16:7-10 and Ex. 7 thereto, ¶4

349.    The policy, custom or practice of the FCSO is set forth in Paragraph Number 5 of the Fresno County document, Exhibit 7, states "Every reasonable effort at diffusing a situation should be considered before deploying chemical agents."

CRG Decl. ¶15, Ex. 13: Defoe Deposition, p.16:7-10 and Ex. 7 thereto, ¶5

350.    The policy, custom or practice of the FCSO is set forth in Paragraph Number 6 of the Fresno County document, Exhibit 7, states "Use chemical agents in a progressive escalation of weaponry.

CRG Decl. ¶15, Ex. 13: Defoe Deposition, p.16:7-10 and Ex. 7 thereto, ¶6

351.    In making the decisions in a case involving someone's private property like the Jessens property Defoe opines, we say (1) "we have a person of no fault of their own had their residence broken into, how are we going to use proper reasonable tactics to safely arrest that person without creating or causing a whole lot damage which is consideration No. 4; (2) this consideration tailors into No. 5, use every reasonable effort at diffusing the situation such as negotiation, and (3) the use of chemical agents in a progressive escalation such as the Avatar robot, the use of a throw phone or other technology prior to or in conjunction with the use of chemical agents.

CRG Decl. ¶15, Ex. 13: Defoe Deposition, p.16:7-10 and Ex. 7 thereto, p. 16:7 – p. 17:20

354.    Based upon his review of the facts, Defoe also opines in Opinion No. 1 that "Fresno Sheriff's Department SWAT/CNT Commander Lieutenant Matt Alexander failed to take into consideration that there was no rush and there were no circumstances that would require deployment of Hostage Rescue Tactics during this incident."

CRG Decl. ¶15, Ex. 13: Defoe Deposition, p. 64:19-21, and Exhibit 19 thereto; CRG Decl. ¶16, Ex. 14, p. 6 of 14.

355.    Defoe also opined in Opinion No. 1 that "based upon my review of the facts in this matter, the location was contained and a Command Post (CP) was established.

CRG Decl. ¶15, Ex. 13: Defoe Deposition, p.64:19-21, and Exhibit 19 thereto; CRG Decl. ¶16, Ex. 14, p. 6 of 14.

**360.**    Defoe also opined in Opinion No. 2 that Fresno Sheriff's Department SWAT/CNT Commander Lieutenant Matt Alexander failed to exhaust all viable options to establish dialogue prior to the consideration of a tactical intervention to include deployment of chemical agent/irritant inside of the Jessen residence.

CRG Decl. ¶15, Ex. 13: Defoe Deposition, p. 64:19-21, p. 70:3 – 76:21, and Exhibit 2 thereto; CRG Decl. ¶16, Ex. 14, p. 6 of 14.

**361.**    Defoe bases his opinions in No. 2 on his review of the facts in this matter that there were no additional calls from 1636 hours (Non-Recorded) until 1738 hours, where Negotiator Michelle Veneman can be heard leaving a message," establishing there were no attempts to establish a dialogue with Mr. Chanly Un for 1 hours and 2 minutes.

CRG Decl. ¶15, Ex. 13: Defoe Deposition, p. 64:19-21, p. 70:3 – 76:21, and Exhibit 2 thereto; CRG Decl. ¶16, Ex. 14, p. 6 of 14.

**370.**    In the first of two Opinions Nos. 4, It is Defoe's opinion that a reasonable officer acting consistent with standard police practices would have formulated a tactical gas plan with the consideration that the Jessen family residence would be damaged.

CRG Decl. ¶15, Ex. 13: Defoe Deposition, p. 64:19-21; p. 78:5 – p. 83:15, and Exhibit 2 thereto; CRG Decl. ¶16, Ex. 14, p. 8 of 14.

**371.**    Based on his review of the facts of this matter, Defoe's Opinion No.4 (first No. 4) is that the Fresno Sheriff's Department SWAT/CNT Commander Lieutenant Matt Alexander failed to formulate a tactical gas plan or approve a tactical gas plan with the consideration and understanding that with each gas deployment, there would be additional damage and contamination to the Jessen residence stating the importance of such a plan in his report as well as Deposition.

CRG Decl. ¶15, Ex. 13: Defoe Deposition, p. 64:19-21; p. 78:5 – p. 83:15, and Exhibit 2 thereto; CRG Decl. ¶16, Ex. 14, p. 8 of 14.

**372.**    Based on his review of the facts of this matter, Defoe further opines in Opinion No. 4 (second No. 4) that a reasonable officer acting consistent with standard police practices would have waited a reasonable amount of time prior to the deployment of additional chemical into the Jessen residence.

CRG Decl. ¶15, Ex. 13: Defoe Deposition, p. 64:19-21; p. 83:16 – p. 92:3, and Exhibit 2 thereto; CRG Decl. ¶16, Ex. 14, p. 9 of 14.

**374.** Defoe opines that indiscriminate use of chemicals must be avoided because of their potential danger and contamination properties.

CRG Decl. ¶15, Ex. 13: Defoe Deposition, p. 64:19-21; p. 78:5 – p. 83:15, and Exhibit 2 thereto; CRG Decl. ¶16, Ex. 14, p. 8 of 14.

**375.** Defoe opines that after the munitions have been deployed, patience must be exercised to allow the agent to contaminate the area and affect the subject even though he doesn't come out it could display his location.

CRG Decl. ¶15, Ex. 13: Defoe Deposition, p. 64:19-21; p. 78:5 – p. 83:15, and Exhibit 2 thereto; CRG Decl. ¶16, Ex. 14, p. 9 of 14.

**376.** Defoe also opines that Lieutenant Alexander failed to establish the quantity of munitions to be deployed at each insertion point and failed to establish the order that the munitions would be delivered into the structure.

CRG Decl. ¶15, Ex. 13: Defoe Deposition, p. 64:19-21; p. 78:5 – p. 83:15, and Exhibit 2 thereto; CRG Decl. ¶16, Ex. 14, p. 9 of 14.

**377.** Defoe also opines that Lieutenant Alexander failed to establish a reasonable time before each subsequent deployment of chemical agent/irritant

CRG Decl. ¶15, Ex. 13: Defoe Deposition, p. 64:19-21; p. 78:5 – p. 83:15, and Exhibit 2 thereto; CRG Decl. ¶16, Ex. 14, p. 9 of 14.

**381.** Sherri Duvivier ("Duvivier") owns a business located in Clovis, California called "Crime Scene and Fatality Decontamination Company" ("CSFD").

CRG Decl. ¶ 17, Ex. 15: Deposition of Sherri Duvivier taken April 16, 2018 ("Duvivier Depo"), p. 8:13 – 25

**382.** CSFD was hired to and decontaminated the Jessen residence of tear gas residue and remnants of tear gas which required decontamination.

CRG Decl. ¶ 17, Ex. 15: Duvivier Depo, p. 11:10-20

**383.** In special protective attire consisting of a biohazard suit gloves and a full face respirator, Duvivier inspected the Jessen residence and in the process took photographs of the residence and exterior.

CRG Decl. ¶ 17, Ex. 15: Duvivier Depo, p. 13:8 – p. 15:1

**384.** Exhibit 1 to the Duvivier Deposition are the photographs Duvivier took during her inspection of the Jessen home following the incident.

CRG Decl. ¶ 17, Ex. 15: Duvivier Depo, p. 16:8-25 & Ex. 1 thereto

**385.**    Exhibit 2 to the Duvivier Deposition is a  memorandum dated August 2, 2016, she prepared from CSFC that describes and goes through everything CSFC did at the Jessen home that consists of 12 pages describing 194 categories of work CSFS did at the Jessen residence in an effort to decontaminate the Jessen residence.

CRG Decl. ¶ 17, Ex. 15: Duvivier Depo, p. 17:2 – 21 and Ex. 2 thereto

**386.**    CSFD's August 2, 2016, Memorandum indicates that "Highest level of personal protection used due to large amounts of hazardous tear gas including but not limited to breaking windows, tearing down doors, damaging appliances and causing structural damage."

CRG Decl. ¶ 17, Ex. 15: Duvivier Depo, p. 17:2 – 21 and Ex. 2 thereto

**387.**    CSFD was required to wear protective gear in performing their decontamination activities in the Jessen residence.

CRG Decl. ¶ 17, Ex. 15: Duvivier Depo, p. 17:22 – p. 18:4

**388.**    When Duvivier first entered the Jessen residence to inspect the premises, there was still tear gas present with every room was exposed to tear gas.

CRG Decl. ¶ 17, Ex. 15: Duvivier Depo, p. 18:14-16; p. 20:17-19

**389.**    Tear gas canisters were introduced and found in every room of the Jessen residence by Duvivier.

CRG Decl. ¶ 17, Ex. 15: Duvivier Depo, p. 21:3-7

**390.**    The "large amounts of hazardous tear gas" stated in her Memorandum was throughout the entire house, in every room in the residence, including the garage and was affected.

CRG Decl. ¶ 17, Ex. 15: Duvivier Depo, p. p. 90:15 – p. 91:14

**392.**    Exhibit 4 is the billing invoice of CSFD for the decontamination work they performed with respect to the "large amounts of noxious gas" at the Jessen residence in the sum of $45,661.35.

CRG Decl. ¶ 17, Ex. 15: Duvivier Depo, p. 126: 9 – 24 and Ex. 4 thereto

**393.**    Mike Webb ("Webb") is employed by MAKK Construction ("MAKK") as operations manager who submitted a bid accepted by the Jessens and performed

remediation construction work on the Jessen residence following the June 11, 2016 incident.

CRG Decl. ¶ 18, Ex. 16: Deposition of Michael Webb taken March 28, 2018 ("Webb Depo"), p. 8:16-21; p. 20:21 – p. 22:18

394.    Webb's original bid on July 22, 2016 was for $181,093.92 and revised on July 25th, 2016 to $173, 279.92 which was accepted by the Jessens.

CRG Decl. ¶ 18, Ex. 16: Webb Depo, p. 22:3 – 9 and Exhibits A & B thereto

395.    The final bill for MAKK remediation construction on the Jessen residence was $194,892.12

CRG Decl. ¶ 18, Ex. 16: Webb Depo, p. 22:19 – p. 23:4 and Exhibit C thereto

397.    MAKK was directly paid by the Jessens for their remediation work.

CRG Decl. ¶ 18, Ex. 16: Webb Depo, p. 92:9-13

398.    When Jessen arrived at his residence following the telephone call from the Fresno County Sheriff's deputy, five (5) law enforcement officers were at the house who were in control of the premises and access to the residence.

David Jessen Declaration, ¶ 2

399.    Jessen was not in control of the premises or residence and in fact, Jessen was prohibited from entering the residence by the officers and within a very short time after his arrival the deputies told Jessen, his wife Gretchen and his daughter to leave the premises.

David Jessen Declaration, ¶ 2

400.    Jessen was requested by one of the deputies to give him a key to the residence understanding he had to comply because of the deputy's legal authority.

David Jessen Declaration, ¶ 3

401.    Jessen was not told he could refuse to give the deputy the key.

David Jessen Declaration, ¶ 3

402.    Jessen understood in giving the deputy the key that only the key would be used to open a door to enter the residence and that no other means would be employed to enter the residence.

David Jessen Declaration, ¶ 3

**403.**    Jessen did not understand that complying with the deputy's request for the key was consent or permission for the officers to destroy his residence.

David Jessen Declaration, ¶ 3

**409.**    Jessen was never asked nor did he give his permission or consent to the Fresno County Sheriff Office or the Clovis Police Department to make entry by means consisting of action destroying the structure of his residence, its windows, doors, interior and exterior walls, pulling the residence off the foundation, destroying fencing, or violently deploying tear gas in every room of his residence, damaging personal property, or contaminating each room to the extent the rooms were not habitable. Had Jessen been aware of such intended conduct, he would have refused to consent to such conduct.

David Jessen Declaration, ¶ 6

**410.**    Jessen was never advised of the actions that would be taken by the Fresno County Sheriff Office or Clovis Police Department to apprehend the trespasser nor did he give his consent to any of their actions as he, along with his wife Gretchen, shortly after they arrived at the residence, were removed from the property and then removed from adjacent property and told to remain away from the property until notified he could return.

David Jessen Declaration, ¶ 7

**411.**    Jessens residence and property is in a sparsely populated area surrounded by almond orchards.

David Jessen Declaration, ¶ 8

**412.**    At the time of this incident no other individuals were in danger as a result of the trespass to Jessens residence by Mr. Un.

David Jessen Declaration, ¶ 8

Joint Statement of Undisputed Material Facts in Support of Motion for Summary Judgment or, in the Alternative, Summary Adjudication of Issues Undisputed Material Facts No. 1

**413.**    Jessen did not consent to the destruction of his residence and its contamination of tear gas in every room of his residence.

David Jessen Declaration, ¶ 9

**414.**    Prior to filing this action, Jessen met with County of Fresno employees or representatives to find out what was required to obtain compensation for the damages to his residence and related damages caused by the FCSO on June 11, 2016.

David Jessen Declaration, ¶ 10

   **415.**    The County representatives informed Jessen he would need to file a formal administrative claim which would be considered and decided by Fresno County Board of Supervisors. He was also told that this is all that was required to recover his damages.

David Jessen Declaration, ¶ 10

   **416.**    Jessen also discussed with representatives of the City of Clovis and determined he would have to file a claim with the City of Clovis which would be considered and decided by the Clovis City Council as to his right to recover compensation for the damages he sustained on June 11, 2016 caused by the CPD SWAT.

David Jessen Declaration, ¶ 11

   **417.**    Pursuant to the instructions from the County of Fresno and the City of Clovis representatives, the Jessens filed "Amended Claim for Damages", dated November 17, 2016, with the County of Fresno (stamped received November 18, 2016) seeking compensation for their damages.

David Jessen Declaration, ¶ 12, Ex. 1; Plaintiffs' Request for Judicial Notice, ¶ 1, Ex. 1

   **418.**    Pursuant to the instructions from the County of Fresno and the City of Clovis representatives, the Jessens filed "Amended Claim for Damages", dated November 28, 2016, with the City of Clovis (stamped received November 29, 2016) seeking compensation for their damages.

David Jessen Declaration, ¶ 13, Ex. 4; Plaintiffs' Request for Judicial Notice, ¶ 4, Ex. 4

   **419.**    Subsequently, Jessens claims with the County of Fresno and City of Clovis were rejected and he was instructed to file an action within six (6) months.

David Jessen Declaration, ¶ 14, 15 and 16

   **420.**    Jessen filed this action as a result of the County of Fresno and City of Clovis rejections and representatives as to the procedure required to be followed to seek compensation.

David Jessen Declaration, ¶ 14 and 16